STATE of Missouri, Respondent,

v.

Robert Andrew SHAFER, Appellant.

No. 75868.

Supreme Court of Missouri, En Banc.

May 26, 1998.

J. Gregory Mermelstein, Asst. Public Defender, Columbia, Robert A. Shafer, Mineral Point, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Theodore A. Bruce, Daniel G. Cierpoit, Asst. Attys. Gen., Jefferson City, for Respondent.

PER CURIAM.

Robert Shafer pled guilty to two counts of murder in the first degree and two counts of armed criminal action. He received two sentences of death and two life sentences. Schafer appealed and also filed a Rule 24.035 motion seeking to set aside his guilty plea and sentence. The motion court overruled the motion on the guilty plea but entered an order setting aside the death sentence. We have jurisdiction. MO. CONST. ART. V, SEC. 3. We affirm the judgment of guilt and the decision of the motion court overruling the Rule 24.035 motion as to the guilty plea. We reverse the decision of the motion court setting aside the death sentence. The sentence of death is affirmed.

## I.

The facts in this case are best told by Shafer himself. Here is his written confession, typed without change in spelling, punctuation, grammar or syntax:

On April 29, 1990 at about 10:30 a.m. I got fired from my job. I called my friend David Steinmeyer and asked him to come over and get high with me. David and I got stoned from about 11:00 a.m. until 1:30 p.m. with my sister, Francine, and a friend. During this time David and I talked about robbing some homosexuals, and beating them up. (My sister did not have any knowledge of this.) At 1:30 p.m., David and I went behind the apartments to play baseball with some friends. We all got stoned and drank some beer. David and I talked more about robbing somebody while playing softball. At about 4:45 p.m. David left to go to work at 5:00 p.m. I stayed and played softball until about 6:30 p.m. I went home, took a shower and got stoned some more. At about 7:25 p.m. I went up to Hardee's on North 94 to talk to David again.

I left Hardee's at 7:45 p.m. and went back home to wait for David to get off work at 8:00 p.m. At 8:15 p.m. David came to my house, we sat and got stoned and talked more about robbing somebody. David changed from his work clothes into some of mine. I went into my sister's bedroom, got the .22 revolver and got 5 .22

shells from the kitchen. I put the shells in my pocket and the .22 into my waistband. At about 8:45 p.m. David and I left my house. We walked behind the Marina apartments until we got to North 94. We walked down North 94 until we got to Tecumseh Street. We walked to Tecumseh and Second Street and talked to a St. Charles County Sheriff's Deputy. The Deputy told us to keep on going. David and I walked to North Main Street, down North Main to the North River Road. (Earlier that day David and I talked about where to look for somebody to rob and decided to look at Blanchette's landing on North River Road.) Once on the North River Broad we went to Blanchette's Landing. We hid in the dark to see how many people were there. We seen 4–5 parked cars. As we approached the eastern part of the landing this is where we saw the guys, Parker and Young. David and I hid in the bathroom and tried to look at Parker and Young. We heard the loud music, saw Parker and Young hugging and drinking beer. (This is when we knew they would be ones we robbed.) David and I walked up to Parker and Young and started talking to them. (It seemed like Young was apprehensive about talking to us.) They asked us what we were doing out so late, and I told them we were going to see some girls in St. Peters. I offered Young $5.00 to drive us to St. Peters. I gave the $5.00 to Parker and he gave it to Young. We sat there and talked for about 5 minutes and drank a beer they gave us. At about 9:30 p.m. we got into the car to go to St. Peters. I got in the car behind Parker on the passenger side and David got behind Young on the driver side. At this point I gave David the gun, but, kept the 5 .22 shells. Young drove down the North River Road until he got to North Main, he drove until he got to Tecumseh Street. At Fourth Street drove until he got to the hill leading to Fifth Street. He drove all the way down Fifth Street until he got to the on ramp for I–70 West. During the drive from the North River Road we all exchanged conversation. They asked us our names, if we got high and other general conversation. (David

and I knew right away Young was gay.) Young did seem real apprehensive about the whole incident, but, hadn't said much so far. Once we were on I–70 West I put 3 of the .22 shells in the gun and gave it back to David to hold. (David and I talked among ourselves about what we would do and Parker asked how come we were whispering.) Once we got to the Cave Springs Exit at St. Peters Young exited. I was going to have him drop us off at the Cave Springs Sunoco, but, I thought my brother-in-law Jeff was at work there, so I didn't. I asked Young to take us farther into St. Peters, which he agreed to. (Young said, "There isn't anything going on, is there?") Young drove the car down Cave Springs Road until he got to Mexico Road. At Mexico Road he turned right, going west until the got to Jungerman Road, he turned left, going south. He went down Jungerman Road until he got to a 7–11 on the right hand side and turned left on Oak Tree, going east. He followed Oak Tree until I told him to turn on Peach Street. Parker then said his nephew lived on Peach, so I told Young it was the wrong street. Young drove down Oak Tree until it turned into Cherry Tree. He drove down Cherry Tree until he came to Timberidge. He drove down Timberidge until he got to New Muegge Road. He drove down New Muegge Road until he came to the Hackman and Country Club Road intersection. At Country Club Road, he took a left and went until he came to Berlekamp. At Berlekamp he went to a circular drive and I told him that was the house. The lights were off so I told him it was the right house, but, nobody was home now. (During this whole drive through St. Peters Young kept asking if anything was wrong, he seemed scared.) (David and I whispered a lot because we didn't know where we were, or if they knew we would rob them.) At this house Young sensed something was wrong and told us to get out and find another ride from there. I asked Young to take us back to I–70 where we would get out and find a ride. At this point Young drove back pretty much the same way we had came as far as I can remember. On the trip back to I–70 we all

talked about partying some time at Parker's house in St. Charles, and David and I decided to take the car when we stopped next time. Back at Cave Springs and I–70 Young got on the south service road, going east. I told him we could be dropped off at another friend's house on the service road. He drove until he got to Spring Road. At Spring Road Young turned right, going south. Spring Road dead ends and at the dead end Young pulled into a driveway on the right side. I told Young to turn off the headlights and the motor, because my "friend" could be asleep. (I got the gun from David now.) As Parker got out he opened the seat for me to get out. On my way out I punched Parker in the face and stomach and pushed him into a hole. He tried to get up and I kicked him again. David was fighting with Young on the other side of the car, but, Young was on top of David. I dragged Parker over to Young, pointed the gun at Young's head and told him to stop fighting. I gave the gun to David an told him to shoot if they tried to get away. I got in the driver's seat, Young behind me, David in the passenger seat and Parker behind him. I told them all we would do is rob them and leave them somewhere unless they tried to get away. (David kept them at gun point while I drove.) I drove back to the south service road and turned left, going west. I took the service road all the way to Mid Rivers Drive. At Mid Rivers Drive I crossed the over-pass to the north service road. I drove down the north service road past the Quick Trip on the right, through old town St. Peters. At the stop sign Young tried to reach for the door handle. Instead of stopping I drove through the stop sign. (From Cave Springs to Mid Rivers Drive Young tried once to choke me from behind.) At the railroad tracks next to the Lone Wolf Park I turned onto Salt River Road. I drove down Salt River Road until I got to Silvers Road on the right side, this is where I planned on robbing Young and Parker because it was dark and away from people. I drove down Silvers Road for a ways and stopped. I turned off the car and headlights next. (Along the way from Cave Springs to Mid Rivers

David asked if we would kill or shoot the guys, I said no until Young tried to choke me and get away.)

After I stopped the car I opened the door to let Young out on the passenger side. David and Parker started to fight and Parker ended up in the ditch. As Young got out he punched me in the face, I fought with him until he also ended up in the ditch. David came up to me after Young was in the ditch and we talked for a few seconds. I seen Parker trying to run away so I chased him. As I caught up to him he fell into the ditch again. I was not too far away when I fired 2 shots from the .22 revolver. I know at least one (1) shot hit Parker in the face because I had some blood on my hand. (Right after I shot Parker I ran over to where Young was laying in the ditch). Young begged me not to shoot him, he said he didn't remember what I looked like, he wouldn't go to the police. I fired one (1) shot at Young, hitting him in the back I think because he was trying to run away into the field. I took the last 2 shells out of my pocket, put them in the gun and fired one (1) shot. I then walked closer to Young and fired another one (1) shot into his head. Young did not move, but, made noises. (David was back at the car.) I walked over to David and he asked how come I shot them, I told him because they tried to get away.

David and I got back into the car, me driving and we to the 90 degree turn in road and turned around. As we came parallel to Young I stopped the car, walked over to Young and got into his pockets. I don't recall for sure what exactly was taken, but, I know that a silver Zippo lighter was. At this point Young was alive, but, unconscious and bleeding bad. I drove the car down to Parker and stopped again. David stayed in the car while I left to empty Parker's pockets. I took some money, close to $100.00 and his Camel cigarettes. Parker was not breathing at all, I assume he was dead.

I got back into the car and drove down Silvers Road until I got to Salt River Road. I took Salt River Road back to Highway C and through old town St. Pe-

ters. I got onto the south service road, going east and drove down that all the way to First Capitol Drive and took First Capitol to Fifth Street back into North St. Charles. Once back in North St. Charles David and I talked about where to leave the car. (It was about 10:30 p.m. when we got back to St. Charles.) I drove around North St. Charles, Boschertown looking for a place to leave the car until about 11:00 p.m. I drove to North Main Street to Bales Memorial Park.

Once at Bales Memorial Park I stopped the car. I started to take out the car stereo, the speakers, cassette tapes and other things. David and I threw out trash, ashtray, cigarette lighter that might have our fingerprints on it. I also took off the vinyl steering wheel cover to alleviate fingerprints.

After we took all this stuff I dumped it in the park area. At about 11:15 p.m. we got to the Town and Country IGA on North 94 where I had decided to leave Young's car. We took the car stereo, speakers, cassette tapes and .22 gun with us. Before I closed the door I kicked the gear shifter to try and remove the plastic casing that had my fingerprints on it. David and I walked through the small field behind Steamboat Lane Apartments where I dropped the plastic from the gear shifter and the vinyl steering wheel cover. David and I walked in the dark behind all of the Marina Apartments until we got to my apartment. I put the stereo, speakers, gun and cassettes under my bedroom window. David and I walked to the front of my apartment and went in, it was 11:19 p.m. My sister Francine, her husband and son were watching VCR tapes. My sister asked how come our shoes were all wet, and what was wrong.

David and I went to my bedroom and took the stereo, speakers, cassettes and gun in through the window. David changed out of my clothes into his work uniform, and I put the clothes in the closet. David and I·went onto the porch to talk. I told him not to say anything until we figured out what to do tomorrow. At 11:25 p.m. David went home.

From 11:25 p.m. until about 1:30 a.m., April 30, 1990, I sat and watched t.v. with my sister and her husband. At 1:30 a.m. I went into my bedroom and locked the door. Until about 3:00 a.m. I got stoned and drunk. At 3:00 a.m. I crawled out the window, and took the stereo, speakers and some of the cassette tapes to my sister's old storage across the street at 755 Marina Drive. I went back home, in through the window. I went into my sister's room and put the .22 revolver back into the closet so my sister would never know it was gone. The (5) empty shell casings I put in my closet. I had to have my brother-in-law, Jeff, unlock my bedroom door from the outside because I got locked in at about 4:00 a.m. I stayed in the bedroom until about 7:30 a.m., April 30, 1990.

At about 7:30 a.m. I had to babysit my nephew Jacob. I didn't do much until 12:00 p.m. when I went to the Town and Country IGA to get a few things and had to walk by Young's car. I noticed it had been moved a few feet from where I left it, but, I kept going. At 3:00 p.m. David got out of school and I went to his house. We talked about the shooting, and he said he talked to somebody at school about it. I got the car keys from David and threw them out behind my apartment, in the woods. (At this point I didn't know that the bodies had been found.) At about 4:00 p.m. David had to go work for about one (1) hour or so and I went home. At about 5:00 p.m. David called and I told him to watch the news to see if they found the bodies. At 5:05 p.m. or so he called to say the police had found the car at the IGA. I went to David's house and watched the police photograph Young's car. I left David's house, went home, called my mother in Salina, Kansas. I told her I might have shot 2 people, but, not to say anything until I called her back later on.

At about 5:30 p.m. I went to Hardee's and told my sister I needed the car to go to confession, I was crying and my sister asked why. I told her that I couldn't tell her yet. David and I went to confession, to my girlfriend Kelly's and a couple of other places to tell people we were leaving town. At about 7:00 p.m. I went to my

brother Michael's house and told him I had to leave town because I was in trouble. He asked me what and I told him I shot (2) people last night. I kissed my (2) nieces and brother goodbye and went home. (David talked to my brother alone. I don't know what he said though.)

I packed some clothes, called David and told him to get ready to leave town. We planned on going to Corpus Christi, Texas, to see my son and then turn ourselves in. At David's house we talked to his mother, Nancy before we left. As we tried to leave my brother, Michael, tried to stop us, I kept on going. As we went down North 94 we passed (2) or (3) police cars. At about 9:00 p.m. David and I were on I–70 West leaving town. I stopped at O'Fallon to get gas. David and I both called our mothers. Our mothers encouraged us to turn ourselves in to police right away. David and I decided to turn ourselves in at St. Charles.

During the ride on I–70 East David and I talked about what to say to police when we were arrested. I made David agree to let me write a statement saying I shot Young and he shot Parker. (This was not the truth, but, David agreed, reluctantly.)

At 9:30 p.m. David and I stopped at the Cave Springs Sunoco to make a few phone calls. I called my sister and told her I would turn myself in at 10:15 p.m. at the St. Charles Police Department, and to be there to ensure my safety.

I drove around St. Charles, went to my girlfriend Kelly's house, but, she was gone. I called my brother-in-law, Jeff, and told him to get rid of the .22 revolver, he asked why, and he wouldn't. At 10:10 p.m. I drove to West Clay Street and parked in Sun Valley Lake Apartments. David and I walked across the street to the Police Department and were arrested at 10:14 p.m. by sheriff's detectives.

David and I were taken to the sheriff's department for questioning next. I then gave Lt. Simcox and Det. Ifland a( ) page statement to the murders. (During the kidnapping of Young and Parker on Spring Road, Young apparently lost his eyeglasses). The .22 revolver was taken into evidence by Sgt. Roach, but, later released

back to my brother-in-law, Jeff. It could be in the hands of Tracy Baltazor in Salina, Kansas. My sister gave it to him after my arrest, saying she didn't want it anymore.

The car stereo, speakers and cassettes were still in the storage until a few after my arrest. I later found out that either Chauncey or Gary Regot might have them. Some of the cassettes are now in evidence. They were in my sister's car at the time of my arrest. The tape case might have Young's name on it.

I don't remember for sure, but, one (1) of the shell casings could be in the evidence that police seized from my sister's car at Sun Valley Lake Apartments. The keys from Young's car are behind my apartment at 868 Marina Drive, or should be.

Schafer waived counsel and pled guilty to first degree murder. He subsequently filed a motion pursuant to Rule 24.035. The motion court upheld the waiver of counsel and guilty plea but determined that the plea court had not properly considered mitigating circumstances in rendering the death sentence and ordered a new penalty-phase proceeding. Both Schafer and the state appealed the motion court's decision. Schafer also appeals the plea court's decision to accept his waiver of counsel and guilty plea.

## II.

Shafer's first four points contend that the guilty plea court erred in accepting his waiver of counsel and guilty plea and that the Rule 24.035 court erred in finding that his waiver of counsel and guilty plea were voluntarily, knowingly and intelligently made.

When an appellant/movant claims that a waiver of counsel or guilty plea violates due process, the state bears the burden of producing evidence that the waiver or plea is competently, voluntarily and understandingly made. *See Morris v. State*, 456 S.W.2d 289, 292 (Mo.1970). Once the state puts forth prima facie evidence of a constitutional waiver or plea, the burden shifts to the petitioner to prove by a preponderance of the evidence that the appellant's/movant's waiver

was involuntary, or unintelligent or unknowing. *Id.*

### Waiver of Counsel

 The United States Supreme Court interprets the Sixth Amendment to permit a person charged with a crime to "conduct his own defense ultimately to his own detriment." *Faretta v. California*, 422 U.S. 806, 834, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). A waiver of the right to counsel must be "knowingly and intelligently" made. *Id.* at 835, 95 S.Ct. 2525. The defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* at 835, 95 S.Ct. 2525, *quoting Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942).

 The right to counsel is a single constitutional right; that is, waiver of the right to counsel does not waive any other right guaranteed by the constitution. U.S. Const. Amend. VI; Mo. Const. Art. I, sec. 18(a). A waiver of counsel does not, however, also waive a jury trial, the right to cross-examine witnesses, the right to present a case for lesser included offenses, the right to an appeal, or the right to present defenses, including diminished capacity. All of these are still available to the *pro se* defendant to present at trial. Waiver of the right to counsel requires a person competent to stand trial to decide freely and with an understanding of the ramifications of that decision that he or she does not wish to have the assistance of counsel's knowledge and experience in facing criminal charges.

For those of us schooled in the complexity of the law, who understand the subtleties and intricacies of trial practice and who appreciate the importance of experience in achieving even a modest professional proficiency, the decision of an untrained defendant facing the death sentence to proceed without assistance of counsel is nearly beyond comprehension. The unspoken argument advanced by appellate counsel and adopted by some courts seems to be that a person untrained in the law who waives the right to counsel could not have understood the meaning of that decision because the person does not understand the law. Therefore, the argument goes, such a person cannot knowingly waive the right to counsel because the person does not understand what he or she has waived. This argument is a tautology – the premise assumes the conclusion.

Shafer directs our attention to *United States v. Cash*, 47 F.3d 1083, 1088–1089 (11th Cir.1995). *Cash* suggests that the question whether a waiver of counsel is knowingly, voluntarily and intelligently made is a function of

(1) the defendant's age, educational background, and physical and mental health; (2) the extent of the defendant's contact with lawyers prior to trial; (3) the defendant's knowledge of the nature of charges, possible defenses, and penalties; (4) the defendant's understanding of rules of procedure, evidence, and courtroom decorum; (5) the defendant's experience in criminal trials; (6) whether standby counsel was appointed and the extent to which that counsel aided the defendant; (7) any mistreatment or coercion of defendant; and (8) whether the defendant was trying to manipulate events of the trial.

 *Faretta* appears not too concerned with the fourth and fifth components of the *Cash* matrix. *Faretta*'s "technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself." *Faretta*, 422 U.S. at 836, 95 S.Ct. 2525. "[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself.... [A] criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation." *Godinez v. Moran*, 509 U.S. 389, 399–400, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). (Emphasis in original.) Contrary to the fourth and fifth *Cash* factors, as will be explained, the right to waive counsel is the right knowingly to proceed in ignorance. It is sufficient for purposes of both the state and federal constitutions that the record, taken in its entirety, shows that the defendant comprehends that a waiver of counsel means that he or she will proceed

into the labyrinth of the law without the assistance of a trained guide. It is not necessary that the defendant be questioned as to all of the things counsel might be able to do to assist the defendant in the legal processes to follow.

Whether the United States Supreme Court would read the due process clause to require the fourth and fifth *Cash* factors is not a matter we must directly decide in this case. Here, Shafer made an early decision to plead guilty while represented by counsel who, according to Shafer, made every effort to convince him otherwise. The decision to plead guilty, which we determine was voluntarily, intelligently and knowingly made at a later point in this opinion, renders the fourth and fifth components of the *Cash* criteria significantly less important than they might have been had Shafer attempted to proceed with trial. We do not address them.

■ Applying the remaining relevant *Cash* criteria to the waiver of counsel: First, the record reflects that Shafer committed these murders at age 19 and pled guilty at age 22. He suffered no physical impairments. He had completed a tenth grade education. The trial court received at least three evaluations of his mental condition, including the results of an extended psychiatric evaluation, and determined that Shafer was competent to proceed to waive counsel and plead guilty.

■ On appeal Shafer now claims that his borderline personality and bipolar disorders render his waiver of counsel (and guilty plea) involuntary. Whether a waiver of counsel and/or guilty plea is voluntary is a function of whether the defendant's decision is an exercise of "his informed free will," *Faretta*, 422 U.S. at 835, 95 S.Ct. 2525, or is "uncoerced." *Godinez*, 509 U.S. at 402, n. 12, 113 S.Ct. 2680. Shafer's argument that his mental condition made his waiver involuntary is tantamount to a claim that he was not competent to waive counsel.

■ Under *Godinez*, the United States Supreme Court interprets the due process clause to require a two-part inquiry when a defendant wishes to waive counsel and/or plead guilty. At the first level, the trial or plea court must determine whether a defen-

dant is competent to stand trial. This inquiry focuses on the defendant's mental capacity. The "question is whether he [the defendant] has the *ability* to understand the proceedings." *Id.* at 401, n. 12, 113 S.Ct. 2680. (Emphasis in original.) If the trial or plea court determines that the defendant has the ability to understand the proceedings—is competent—the inquiry proceeds to a second level and asks whether the waiver or plea is voluntarily and knowingly made. This second-level examination determines "whether the defendant actually *does* understand the significance and consequences of a particular decision [that is, knowing] and whether the decision is uncoerced [that is, voluntary]." *Id.* (Emphasis in original.) In sum, a defendant who is competent to stand trial is also competent to waive counsel and plead guilty, but only if the defendant also waives counsel and/or pleads guilty knowingly and voluntarily.

All but one of the experts in this case reported or testified that Shafer was competent to stand trial. Two experts, Drs. Cuneo and Kohrs, claimed that Shafer, while competent to stand trial, was not competent to proceed *pro se*. As a matter of law, the distinction that Drs. Cuneo and Kuhrs attempted to draw is meaningless. That is the central teaching of *Godinez*.

■ In related points, Shafer contends that the plea court erred in failing to grant a fourth mental examination and erred in refusing to conduct a further hearing on his competency. As to the former claim, section 552.020.2, RSMo 1994, provides:

Wherever any judge has reasonable cause to believe that the accused lacks mental fitness to proceed, he shall, upon his own motion or upon motion filed by the state or by or on behalf of the accused, by order of record, appoint one or more private psychiatrists or psychologists . . . to have the accused so examined. . . .

Shafer stated: "I think if another evaluation was ordered, it would give me a chance to say what I want to say and leave no doubt as to my competency." ***Hearing on Motion to Waive Counsel, January 4, 1993,*** Tr. 8. (This record also contains the guilty plea and

sentencing.) This statement effectively terminates Shafer's claim on appeal since the trial court found Shafer competent in a manner consistent with the purposes for which Shafer sought the examination.

█ As to the second point, Shafer claims that *Pate v. Robinson*, 383 U.S. 375, 385, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), requires a hearing when there is a bona fide doubt as to the defendant's competence and that the plea court erred in failing to conduct a more extensive competency hearing in this case. Courts are given broad discretion in determining whether a competency hearing is necessary. *Howard v. State*, 698 S.W.2d 23, 25 (Mo.App.1985). Absent a factual basis indicating a questionable mental condition, no competency hearing need be ordered. *State v. Tokar*, 918 S.W.2d 753 (Mo. banc 1996).

We reject Shafer's claim that he lacked competence to waive counsel and plead guilty. The testimony and reports of all of the mental health professionals to the plea court agreed that Shafer was competent to stand trial. There was no bona fide doubt as to his competence and no further hearing was required.

Considering the second *Cash* factor, the record shows that Shafer had contact with seven different lawyers prior to the plea court accepting his waiver of counsel. Each of these attorneys was assigned by the public defender's office. After the state filed its notice of aggravating circumstances, the record shows that the public defender assigned death penalty counsel to Shafer. The record reveals quite clearly that Shafer's dissatisfaction with his counsel stemmed in large measure from the efforts of counsel to thwart his decision to plead guilty. Thus, the record refutes any claim that Shafer had limited contact with lawyers prior to his waiver of counsel. Moreover, that contact attempted to discourage the course of action Shafer ultimately pursued. In Shafer's own words: "I tried to give a confession for almost the whole time I was here, I wanted to confess to the crime and the attorney stopped me and I finally did it Friday and I did it without—or, against [the attorney's] wishes. I don't want to cooperate with counsel. I don't want an

attorney. ..." *Hearing on Motion to Proceed Pro Se, July 27, 1992*, Tr. 6.

The third *Cash* factor focuses on Shafer's knowledge of the nature of the charges, possible defense and penalties. The record shows that Shafer understood the nature of the charges against him, that his appointed counsel attempted to discuss the defenses he might employ, including those based on psychological evaluations, and that he refused to consider those defenses in light of his firm desire to plead guilty and receive the death penalty. Again, we rely on Shafer's own statement of his strategy: "[M]y whole goal to be my own attorney is to plead guilty to death:" *Id.* at 15. In a manner consistent with this strategy, Shafer repeatedly stated that he did not want an attorney. He filed at least two motions to that effect, each ending with the conclusion that "[d]efendant does not want to proceed with counsel due to the severity of the consequences that could be dealt to him if the attorney made the wrong decision, against the defendant's best interest or wishes." *Pro Se Motions to Discharge Counsel of Record, April 27, 1992 and July 14, 1992*. Dr. Cuneo, a psychologist, testified that Shafer "does have a more than superficial knowledge of the law." *Hearing on Motion to Waive Counsel, July 27, 1992*, Tr. 30. Shafer testified, "I don't want to cooperate with counsel. I don't want an attorney. I think that I'm best represented by myself because I know better than anybody what happened and that I've been on the case a lot longer than anybody." *Id.* at 6 –7. Shafer also said:

I will not cooperate with these attorneys any more. They're not doing anything for me. She's [Shafer's attorney] here to stop me from pleading guilty. I don't see—you know, if I want to plead guilty that should be my decision, not hers or the prosecutor's or yours [the court's]. That's my decision. I'm the one who's going to pay for it, nobody else. I don't know what the deal is. I want to plead guilty and get this over with and this is just dragging on and on and on.

You know, I understand you gotta testify so it's fair to me, but, you know, it isn't fair to me because it's just getting dragged

on and on and on, you know. I don't want her on my case. I don't want any attorney at all.

*Id.* at 46. After all of this, the court advised Shafer that it "would be to your advantage to have an attorney, as the Court believes everyone should be represented by counsel to get legal advice, but this is your decision." *Hearing on Motion to Proceed Pro Se, January 4, 1993*, Tr. 6–7. The court also found "that based upon its review of you personally and the communications, your intelligence level that the Court has observed of you, your—your letters that you have sent the Court and are part of the court file, all of those have convinced the Court that the Court believes you know what you're doing. Do you feel you know what you're doing?" Shafer answered, "Yes, I do." *Id.* at 13. Shafer also testified that he had read *Faretta*, understood from reading that case that he had a right to counsel and the right to represent himself and that he understood the ramifications of choosing to represent himself. Finally, Shafer executed a written waiver of counsel in open court. That written waiver complied with section 600.051.1, RSMo 1994, and stated that Shafer waived counsel "knowingly and intelligently." The written waiver also set out his understanding of the charges against him, the minimum and maximum penalties he faced if found guilty of those charges, his right to a trial by jury on those charges, and his right to counsel even if he could not afford one.

The plea court met the sixth *Cash* factor by ordering Shafer's former counsel to remain available during the guilty plea and sentencing.

█ The seventh *Cash* factor considers the voluntariness of the waiver of counsel. Shafer claims in his post-conviction motion that his waiver of counsel was not voluntary. A decision to plead guilty or waive counsel is voluntary if the defendant may exercise free will in making that decision—that the choice is made without physical or psychological coercion. *State v. Lytle*, 715 S.W.2d 910, 915 (Mo. banc 1986).

The record in this case shows that Shafer was free from coercion in deciding to waive counsel. When asked if "anyone forced you or in any way tried to coerce you or suggest to you that you should fire your attorney and proceed *pro se*," Shafer responded: "No. From the beginning I really didn't even want an attorney.... No one's forcing me...." *Hearing of Motion To Waive Counsel, July 27, 1992*, Tr. 9.

In response to the eighth *Cash* factor, there is no indication that Shafer attempted to manipulate the proceedings.

As to the waiver-of-counsel issue, we conclude that the record supports the trial court's conclusion that Shafer was competent to waive counsel and that he did so knowingly and voluntarily. Schafer's points challenging the constitutionality of his waiver of counsel are denied.

### Guilty Plea

█ Due process requires that a person who wishes to plead guilty must be competent to do so and must enter the plea knowingly and voluntarily.

As previously discussed, the plea court found and the record supports a conclusion that Shafer was competent to stand trial. Under *Godinez*, that level of competence is sufficient to permit Shafer to proceed to plead guilty if the plea is knowingly and voluntarily entered.

█ Unlike a waiver of the Sixth Amendment right to counsel, a guilty plea is a waiver of several constitutional rights. The first is the privilege against self-incrimination guaranteed by the Fifth and Fourteenth Amendments to the federal constitution and article I, section 19 of the Missouri Constitution. Second, a guilty plea waives the right to a trial by jury guaranteed by the Sixth and Fourteenth Amendments to the federal constitution and article I, sections 18(a) and 22(a) of the state constitution. Third, a guilty plea waives the right to confront one's accusers guaranteed by the Sixth and Fourteenth Amendment to the federal constitution and article I, section 18(a) of the state constitution. In addition to these rights, article I, section 18(a) of the Missouri Constitution provides the right "to demand the nature and cause of the accusation" and "to

have process to compel the attendance of witnesses on his behalf." These are rights guaranteed by these constitutions of which the record taken as a whole must show that a person pleading guilty is aware, understands, and freely relinquishes before a guilty plea is effective.

The record shows that the trial court asked Shafer whether he realized that a guilty plea waived the right against self-incrimination; the right to a jury trial; the right to confront by cross-examination the witnesses against him; the right to subpoena witnesses and present evidence; the presumption of his innocence; the requirement that he be found guilty beyond a reasonable doubt; and the right to present mitigation evidence to a jury during the penalty phase of a first degree murder trial. Shafer acknowledged that he understood these rights and wished to waive them. Shafer also acknowledged that the possibility of a death sentence awaited him if he proceeded with his desire to plead guilty.

 Shafer's appeal and post-conviction motion under Rule 24.035 now assert that his guilty plea was not knowing because the plea court did not: advise him of the intent required for first degree murder; explain deliberation; inform him of potential defenses that he could employ at trial, including diminished capacity; suggest the possibility of lesser included offenses; describe the negative impact a guilty plea would have on his appeal; or remind him that a jury would need a unanimous vote to convict him.

 The first assignment of plea court error in accepting the guilty plea and of motion court error in failing to set aside the guilty plea is the only claim that has a clear textual pedigree in either constitution. Schafer claims that the plea court did not advise him of the intent required for first degree murder. MO. CONST. ART. I, SEC. 18(a). This assertion is patently false. The plea court read the charges to Shafer and included the elements of the crimes of first degree murder and armed criminal action in that recitation. Shafer indicated that he heard and understood what the plea court said. This admission removes the second issue—that the plea court failed to define

"deliberation." Neither the federal or state constitutions require the plea court to define legal words used in the plea court's questions and statement. Where the defendant waives his right to counsel, the consequences of the waiver place a burden on the defendant to indicate areas where his lack of experience or training create confusion or uncertainty for him. By expressly indicating that he understood the charges and by his willingness to indicate at other places on the record when he did not understand the proceedings, the record shows that Shafer agreed that he knew and understood the meaning of the word "deliberate" in the context of his case. To conclude otherwise would be to deny Shafer's facility with and understanding of the English language made clear in Shafer's written and videotaped confessions. Indeed, one cannot view the videotaped confession in this case and the calm, cold and articulate manner in which Shafer describes his actions and harbor any doubt as to Shafer's understanding of the English language generally and of the word "deliberation" specifically.

As to the remaining assignment of motion court error on the question whether Shafer knowingly pled guilty, the requirements that Shafer cites are imposed by judicial decisions that find no direct textual support in the federal or state constitutions. Indeed, the body of case law that now surrounds these issues seems more revealing of judicial antipathy for guilty pleas than honoring a constitutional principle. *See*, for example, *Wilkins v. Bowersox*, 933 F.Supp. 1496 (W.D.Mo. 1996). Nevertheless, we will consider each of Shafer's remaining claims.

 The entire record before the plea court determines whether the plea court erred in accepting the guilty plea and the motion court erred in failing to set the plea aside. Shafer articulated his reasons for seeking the death penalty on the record. First, he admitted his guilt—his deliberate killing of the victims in this case. Second, and these are his words, "I've been incarcerated in the county jail since April 30 th, 1990, and my conscience is really bothering me. I've talked to doctors, priests and family members and nobody can tell me how to

overcome the guilt I am facing. Nobody can change what ... happened...." *Hearing on Motion to Waive Counsel, January 4, 1993*, Tr. 10. Third, Shafer suggested that he decided to plead guilty "for the benefit of the victims' families. I think they have a right to know what I did and why I did it." *Hearing on Motion to Waive Counsel, July 27, 1992*, Tr. 8. Fourth, "I don't want to go through all the lengthy appeals with attorneys. I can just waive my appeals, whatever I have to do to get it over with." *Id.* at 9.

It is true that the plea court might have asked Shafer more directly whether he understood the minor elements of trial and appeal that he relinquished by pleading guilty. Although Shafer did not directly answer those questions he now claims the trial court should have asked, Shafer voluntarily testified that whatever defenses were available to him, including diminished capacity, the possibility of lesser-included offenses and the impact of the guilty plea on his appeal made no difference to him at the time of his plea. The fact that Shafer now wishes he had chosen a different path—as evidenced by his appeal and post-conviction motion—does not render the path he chose at the time of his waiver of counsel and guilty plea either unknowing or involuntary. Facing death in prison, either at the end of a long, natural life spent there or as a result of the imposition of the death penalty, it is rational for a person to decide to terminate the prison experience at the earliest possible time and hasten death by lethal injection. This is so, even though a majority of persons might choose otherwise. A subsequent discovery that one's life is more precious than previously thought, that prison is not as abhorrent as anticipated, or that guilt dissipates over time, does not render his decision to plead guilty an unknowing decision at the time Shafer pleaded guilty.

Specifically, on the questions Shafer claimed the plea court should have asked, Shafer indicated that his counsel had suggested that he prevaricate when undergoing psychological examinations for the purpose of building a defense. Shafer testified:

"I know I'm competent, they know that I'm competent, the Court knows I'm com-petent, but I think that evaluation will come back and hurt this case. The doctor said that I was—that I faked symptomology, which I was told to do by my attorneys, and I think that evaluation's going to come back and hurt me later, meaning that if [my attorney] decides to fight me or someone decides to fight it later if I decide to waive all my appeals, they'll use that as a basis for that...."

*Hearing on Motion to Waive Counsel, January 4, 1993*, Tr. 7–8. This shows a lack of interest in pursuing a defense of diminished capacity on Shafer's part and effectively answers the question whether Shafer understood that he had the possibility of offering a diminished capacity defense and that his plea of guilty would have a negative impact on his appeals.

As to other defenses during the guilty plea, the state informed Shafer that a ballistics test performed on the gun Shafer claimed he used in the killings did not provide a positive match with the bullets found in the victims' bodies. Shafer said, "Well, I can only say that I'm sorry that their tests weren't accurate, but I know that was the gun." *Id.* at 39. He also said, as part of the same colloquy, "Well, I would like to say that I still want to plead guilty, but I want to say that you [the state] haven't given us everything and we've asked quite a few times. We haven't got no ballistics reports, only you say that they didn't match and they're saying it, but there's no other official report. There's a lot of things that we haven't got, but I still want to plead guilty despite that." *Id.* at 39–40. This is a clear indication of Shafer's disinterest in pursuing any defenses or lesser included offenses to the charges at the time of his guilty plea.

The plea court did not ask Shafer whether he understood that a jury—to which he understands he had a right—would be required to render a unanimous verdict. This failure, if error, is harmless error under these circumstances.

On review of the record, we are firmly convinced that Shafer knowingly pled guilty. He entered his guilty plea with his eyes open, understanding the effect of that plea on

his legal options and on the possibility of his receiving a death sentence.

■ In order to affirm the plea court's decision to accept the guilty plea, we must also determine whether Shafer pled guilty voluntarily. During the plea, the plea court asked whether Shafer suffered from the influence of drugs or alcohol at the time of the plea. Shafer indicated that he did not. The plea court also asked whether Shafer was proceeding voluntarily and without the suggestion of any other person. Shafer testified that he was proceeding freely and voluntarily. Shafer also indicated that his jail conditions, which he had protested, had no affect on his decision to plead guilty. "I don't want the Court to be under the impression that I am only pleading guilty to be free of my problems in the jail. [An attorney] is going to say that my problems are the reason I'm going to plead guilty. I told the Court on July 27 th why I wanted to plead guilty...." *Id.* at 10.

Having reviewed the entire record, we are firmly convinced that Shafer voluntarily entered a plea of guilty to two counts of first degree murder and two counts of armed criminal action.

■ In a related point, Shafer contends that his guilty plea lacked a factual basis. The above-quoted written confession, coupled with the video confession, speaks for itself and does so without equivocation or doubt. Every assertion in the confession is consistent with the physical facts in this case, with the exception of the ballistics tests on the .22 revolver. When the prosecutor mentioned to Shafer that the ballistics tests were not conclusive, Shafer rejected the accuracy of the test, and stated, "Well, I can only say that I'm sorry that their tests weren't accurate, but I know that was the gun." *Id.* at 39.

■ Under Rule 24.02(e), a court may not enter judgment on a plea of guilty unless it determines there is a factual basis for the plea. If the plea of guilty is voluntarily and understandingly made and unequivocal as to the factual requisites necessary to establish each element of an offense, the plea itself forms a factual basis for the guilty plea. *Milligan v. State*, 772 S.W.2d 736, 738–39

(Mo.App.1989). *See also Robinson v. State*, 491 S.W.2d 314, 315 (Mo.1973). The plea court had before it a collection of facts that far exceed the threshold requirement of Rule 24.02(e) for entering judgment on a plea of guilty.

All of Shafer's points challenging the decision to waive counsel and plead guilty are denied.

## III.

### Aggravating Circumstances Timely Filed

■ Shafer argues that the state failed to file aggravating circumstances within a reasonable time before the commencement of the first stage of trial in violation of section 565.005.1, RSMo 1994. Shafer was arrested on April 30, 1990. On November 30, 1990, he requested notice of aggravating circumstances, which the state filed on July 31, 1992, following Shafer's confession. Shafer's trial was set for March 22, 1993. On January 4, 1993, Shafer entered a plea of guilty.

Shafer has not explained how the state's filing of aggravating circumstances six months prior to his plea of guilty and eight months prior to his trial setting was either unreasonable or prejudicial. The state filed notice of aggravating circumstances within a reasonable time before the guilty plea.

The point is denied.

## IV.

### Mitigating Circumstances Allegedly Not Considered

■ Shafer alleges that the sentencing court erred or plainly erred in sentencing him to death without considering mitigating circumstances. As a preliminary matter, we note that Shafer made no objection to the court sentencing him without hearing penalty-phase presentation of mitigating evidence; thus, we review only for plain error. Rule 30.20; *State v. Hunter*, 840 S.W.2d 850, 867–868 (Mo. banc 1992), *cert. denied*, 509 U.S. 926, 113 S.Ct. 3047, 125 L.Ed.2d 732 (1993).

Shafer attempts to find support for his argument from *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). *Lock-*

*ett* stands for the proposition that a sentencer may not be precluded from considering relevant mitigating evidence. Shafer cannot claim that the trial court refused to consider relevant mitigating evidence.

It is true that Shafer offered no mitigating evidence at his sentencing hearing. However, that does not mean that the judge failed to consider mitigating evidence as required by Missouri's statutory scheme. SECTION 565.032.3, RSMo 1994. This Court presumes that the trial judge knew and followed the law during Shafer's sentencing. *State v. Roll,* 942 S.W.2d 370 (Mo. banc), *cert denied,* —— U.S. ——, 118 S.Ct. 378, 139 L.Ed.2d 295 (1997); *State v. Feltrop,* 803 S.W.2d 1, 16 (Mo. banc), *cert. denied,* 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). We do not require the sentencing court to read instructions to itself.

Mitigating evidence can include such things as a defendant's age, background, mental or emotional development and state of intoxication, past criminal history, victim's consent, and the defendant's level of participation in the crime. SECTION 565.032.3, RSMo 1994; *Parker v. Dugger,* 498 U.S. 308, 314, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991); *Eddings v. Oklahoma* 455 U.S. 104, 114–115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Much of this evidence was before the plea court before it sentenced Shafer.

Shafer's age is clearly within the record:

BY THE COURT:

Q. . . . I do need your full, legal name on the record.

A. Robert Andrew Shafer.

Q. And, Mr. Shafer, how old a man are you?

A. Twenty-two.

Q. Your date of birth?

A. August 19 th, 1970.

*Hearing on Motion to Proceed Pro Se*, January 4, 1993, Tr. 11.

Information about Shafer's education was before the plea court:

Q. And what's the highest grade that you've completed in school?

A. Ten.

*Id.* at 11–12.

The plea court had before it several evaluations of Shafer's mental state and emotional development and capacity. The evaluation that took place closest to Shafer's plea of guilty, an evaluation by Richard H. Goudy from Biggs Forensic Center, found that Shafer was mentally competent to proceed *pro se* and enter a plea of guilty. This colloquy took place:

THE COURT: Now, Mr. Shafer, the first issue is whether or not you wish to discharge your counsel. The Court has found that you're competent to do so, and if you want to discharge counsel, the Court will allow you to do so, but this has to be your decision and you have to be doing this freely and voluntarily and intelligently and without any coercion or any—any other reasons, and I must advise you that the Court believes that you would—it would be to your advantage to have an attorney, as the Court believes everyone should be represented by counsel to get legal advice, but this is your decision. Can you tell me what you wish to do?

* * *

SHAFER: Okay. First, I would like to say that the evaluation I was given at Fulton on—between August 24 th and September 21 st was influenced by my attorneys. I still was represented by [an attorney], and then the capital office at that point, and I was advised to—to give information that wasn't true or that would try to downplay my competency.

I know that I'm competent . . . the Court knows I'm competent, but I think that evaluation will later come back and hurt this case. The doctor said that I was—that I faked symptomology, which I was told to do by my attorneys, and I think that evaluation's going to come back and hurt me later, meaning that if [an attorney] decides to fight me or someone decides to fight it later if I decide to waive all my appeals, they'll use that as a basis

for that, and I think that in light of that, I think that maybe another evaluation should be ordered where I can make my own decisions.

The first four evaluations, I haven't really been able to. I've had two private ones where I was—I was told almost exactly what to say, and the two ones by the State were just about the same and I didn't get a chance to say what I wanted to say. I think if another evaluation was ordered, it would give me a chance to say what I want to say and leave no doubt as to my competency.

THE COURT: All right. Well, the Court is not—you know, has already had, I believe, three psychiatric evaluations of you, and as I've indicated, the Court is not concerned in regard to your competency any longer. If you don't want to proceed today, your case is set as the number one jury trial for March 22 nd through April 2 nd and we can proceed with that trial on that date.

I'm not going to have any more hearings like this prior to the trial, and I don't mean to pressure you one way or the other, because you certainly have a right to and I want you to be represented by counsel and you have a right to a jury trial and I want to offer you that right and we're set to proceed with that and there's no reason not to have that jury trial for you.

* * *

SHAFER: Okay. I don't want the Court to be under the impression that I am only pleading guilty to be free of my problems in the jail. [An attorney] is going to say that my problems are the reason I'm going to plead guilty. I told the Court on July 27 th why I wanted to plead guilty and I want to reiterate those reasons now.

*Id.* at 6–10.

The plea court also had evidence of Shafer's drug and alcohol consumption on the day and night of the murders in the record. In both his written confession and his videotaped confession, Shafer very carefully outlined the hours during which he "got high" and drank alcohol.

The sentencing court also had before it Shafer's statement about the guilty feelings he was harboring and his remorse:

I've been incarcerated in the county jail since April 30 th, 1990, and my conscience is really bothering me. I've talked to doctors, priests and family members and nobody can tell me how to overcome the guilt that I am facing. Nobody can change what—change what happened . . . .

*Id.* at 10.

And, perhaps most significantly, the court—through Shafer's admissions—had a clear picture of the role both victims and both assailants played in the murder. Shafer admitted that he obtained the gun, loaded it, fired it at the victims, and did so to avoid witnesses to his crimes.

As is obvious from the above discussion, the court had a great deal of mitigating evidence before it and was aware of the role of mitigating evidence in reaching a sentencing decision. Shafer voluntarily and knowingly waived his opportunity to present mitigating evidence at sentencing. It was not necessary for the plea court to replay the videotaped confession that it viewed just moments earlier. The court noted, during sentencing, that it had considered all the evidence before it before arriving at a sentencing decision. This statement accurately reflects the record and meets the requirements of section 565.032. Of course, the sentencing court had no obligation to consider mitigating evidence that was not presented.

Shafer's decision not to present additional evidence in mitigation can be attributed to strategy. Just as this Court imputes strategic decisions made by defendants who are represented by counsel to the defendant, we impute Shafer's strategic decisions to him. *See State v. Roberts,* 948 S.W.2d 577, 594 (Mo. banc 1997). From the time he turned himself in, Shafer employed a strategy to assure he would receive the death penalty.

The point is denied.

## V.

### The State's Appeal

In part relevant to the state's appeal, Shafer's Rule 24.035 motion averred that he did

not waive counsel "voluntarily, knowingly, and intelligently." The motion court concluded that "[m]ovant was not competent to waive counsel *for the sentencing portion* of the proceedings." (Emphasis added.) Shafer's Rule 24.035 motion also asserted that his decision

to waive the investigation, and presentation of mitigating evidence at his penalty phase hearing was not voluntarily, knowingly and intelligently made in that:

(1) Movant suffered from mental disease at the time he decided not to present any mitigating evidence in the capital sentencing phase of his trial. As a result of his mental disease, movant did not have the ability to think logically, and to voluntarily, knowingly and intelligently waive the presentation of mitigating evidence;

(2) Movant's decision not to present any mitigating evidence was without a detailed explanation by the trial judge of his rights at the capital sentencing hearing, including a definition in layman's terms of the term "mitigating" evidence;

(3) Movant's decision not to present mitigating evidence was made directly affected and influenced by physical, sexual and verbal assaults directed at him during his stay at the St. Charles County jail. The jail abuses directed at movant rose to the level of cruel and unusual punishment, and rendered his decision not to present mitigating evidence involuntary.

The motion court also found that "[n]o *presentence* investigation was offered or ordered, and the Movant did not waive a presentence investigation;" "that the sentencing proceeding in this case violated [section 557.026, RSMo 1994] because a presentence investigation was neither performed or waived;" "that the sentencing proceeding in this case violated [Rule 29.07(a) ];" and that the trial court failed adequately to inform "movant of his options at the sentencing stage" and that this failure "made movant's waiver of the presentation of mitigating evidence not voluntary, knowing and intelligent."

The motion court sustained the Rule 24.035 motion on these points, vacated the

death sentence, and ordered a new sentencing procedure. The state appeals.

### *Shafer's Competence to Waive Counsel at the Sentencing Phase*

The motion court's conclusion that Shafer lacked competence to waive counsel for the sentencing phase of the proceedings is patently incorrect and therefore clearly erroneous as a matter of law. The plea court and the motion court both concluded that Shafer was competent to stand trial. As previously discussed, this is the level of competence required by the due process clause to support a waiver of counsel—at any stage of a criminal proceeding. *Godinez.*

### *The Presentence Investigation Issue*

The second portion of the motion court's ruling concluded that Shafer's waiver of counsel at the sentencing stage proceeded from the plea court's "failure ... to adequately inform the movant of his options at the sentencing stage" and this failure "made the movant's waiver of the presentation of mitigating evidence not voluntary, knowing and intelligent." According to the motion court, these conclusions proceed from the plea court's failure to offer the appellant the option of a presentence investigation.

As Shafer points out, the state's brief does not address this contention directly in its point relied on; instead, the state relegates its claim to the argument section of the point. We need not decide here whether this is procedurally sufficient to preserve the issue for our review. This is because the challenged portion of the motion court's ruling— that the plea court failed to offer Shafer a presentence investigation and that that failure rendered his waiver of the opportunity to present mitigating evidence unknowing, unintelligent and uninformed—finds no required pleading predicate in Shafer's Rule 24.035 motion.

We have already set out Shafer's Rule 24.035 motion on this point at the beginning of this section of the opinion. Shafer's motion makes no effort to claim that the trial court denied Shafer the opportunity to have a presentence investigation. It claims instead that Shafer's "decision to waive the

investigation, and presentation of mitigating evidence at his penalty phase hearing was not voluntarily, knowingly and intelligently made." In a section of the amended Rule 24.035 motion entitled, "Facts in Support of Claim 8(D)," Shafer's motion says, "Nor did he [the plea court] offer a pre-sentence investigation from which mitigating evidence could be ascertained." Shafer's amended motion offers no explanation of the factual or legal prejudice that follows from this declarative sentence.

Shafer does no more than state the fact that no pre-sentence investigation occurred. Though Shafer's amended pleadings do not say so, the post-conviction court's ruling seems to be founded on the belief that the absence of such an investigation is *per se* grounds to set aside the sentence, whether or not prejudice results from that failure. Shafer's pleadings are devoid of any assertion that he has a constitutional or statutory right to a pre-sentence investigation, and he states no facts showing what a pre-sentence investigation would have revealed of which Shafer was unaware at the time of the sentencing portion of his plea hearing.

 The motion court has authority only to decide those claims that are brought before it in timely pleadings setting out facts, not legal conclusions that, if true, would entitle movant to relief. Any claim not raised in a timely Rule 24.035 motion is a complete waiver of that claim. RULE 24.035(b). Our *sua sponte* review of the motion court's and our jurisdiction requires us to conclude that Shafer's claim as to his asserted right to a pre-sentence investigation is procedurally barred because of his failure to assert the claim.

 Shafer's claim that he did not knowingly, voluntarily and intelligently waive the investigation and presentation of mitigating evidence is all that remains. This claim is without substance. First, the record reveals without equivocation that Shafer understood that proceeding to the sentencing stage carried with it the possibility of the plea court imposing the death sentence. As we have previously noted, arriving at this point was the purpose of Shafer's strategy of waiving counsel and pleading guilty. "[M]y whole goal to be my own attorney is to plead guilty to death." *Hearing on Motion to Proceed Pro Se, July 27, 1992,* Tr. 15.

Second, the plea court, which had previously cautioned Shafer on a number of occasions during the hearing that it would stop the proceedings at any point that Shafer wished to have an attorney, asked Shafer again whether he wanted counsel before proceeding to the sentencing phase. The plea court said, "[Y]ou're entitled to again be represented by counsel and a right to have a jury determine this sentence that should be imposed on you, do you understand that?" The plea court also said, "And is it your desire to continue to waive counsel as well as ... waive a jury trial?" Shafer answered "yes" to both questions. *Hearing on Motion to Proceed Pro Se, January 4, 1993*, Tr. 41–2.

Third, the plea court expressly asked Shafer whether he wished to offer mitigating evidence or a mitigating statement—"which means on why [sic] the Court should sympathize with you and why the Court should give you the lesser of the two sentences, meaning give you life instead of the death sentence, you understand that." Shafer replied, "Yes I understand that."

The plea court then asked, "All right. Do you wish to offer any statement or evidence of mitigation?"

Shafer said, "No, I don't."

The plea court asked, "Do you wish to make any statement at all to the Court in regard to what sentence the Court should impose against you?"

Shafer said, "Well, I'd like to go back to the letter that I gave the Court, the first letter, and all of the letters that I have sent to the Court and take that into consideration when I ask for the death penalty."

The colloquy continued:

"And by this, do you understand that you're requesting the Court to impose the death penalty against you?"

"Yes, I do."

"And that's what you're requesting?"

"Yes, I am."

*Id.* at 42–43.

Fourth, the record also refutes Shafer's after-the-sentencing claim that jail conditions caused him to enter his plea and waive the presentation of evidence of mitigating circumstances. *See* section II (Guilty Plea) and section IV, *supra.*

The motion court clearly erred in finding Shafer not competent to waive counsel for the sentencing phase. The motion court did not have the authority to consider Shafer's claim that the sentence should be vacated because the plea court did not offer him a presentence investigation and report. By failing to plead that issue, Shafer waived it procedurally.

The judgment of the motion court vacating Shafer's sentence is reversed.

## VI.

### Aggravating Circumstances Allegedly Invalid

Shafer sets out several claims of error regarding the aggravating circumstances: that the plea court found a vague, uncharged aggravating circumstance; that the plea court improperly considered letters written by Shafer; that the aggravating circumstances were impermissibly duplicative; that the plea court erred in finding that the victim was a potential witness in any past or pending investigation; that the other aggravating circumstances were unsupported by evidence; and that the aggravating circumstances were based on a post-arraignment interview of Shafer by agents of the prosecutor in violation of the right to counsel. No objection was entered at the hearing to any of the aggravating circumstances filed by the state. Therefore, we review his claims for plain error only. RULE 30.20

■■■ Only one valid statutory aggravating circumstance need exist to justify imposition of the sentence of death; thus, any claims that additional aggravating circumstances were defective afford no basis for relief. *State v. Weaver*, 912 S.W.2d 499, 522 (Mo. banc 1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996); *State v. Tokar*, 918 S.W.2d 753 (Mo. banc), *cert. de-*

*nied*, —— U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996).

### *Aggravating Circumstances Allegedly Unsupported by Evidence*

■■■ The evidence before the court in this case clearly supported a finding of four aggravating circumstances presented by the state and found by the sentencing court. A constitutionally valid guilty plea is the strongest evidence available of a defendant's role in and commission of aggravating circumstances. A constitutionally valid guilty plea removes all doubt on fact issues. Shafer admitted that he murdered Young while engaged in the commission of another homicide—that of Parker. Therefore, the plea court properly found the aggravating circumstance set out in section 565.032.2(2), RSMo 1994.

Shafer admitted that he committed the offense of murder in the first degree for the purpose of receiving money ("nearly a hundred dollars") and other things of monetary value (an automobile, stereo equipment and a silver lighter). SECTION 565.032.2(4), RSMo 1994.

Shafer admitted that he murdered Parker and Young during the commission of a robbery. SECTION 565.032.2(11), RSMo 1994. Shafer admitted that he began the evening with the purpose of seeking out homosexuals to beat up and rob.

■■■ Shafer murdered a witness or potential witness in any past or pending investigation or past or pending prosecution. SECTION 565.032.2(12), RSMo 1994. This aggravating circumstance exists when a reasonable trier of fact can infer that the defendant foresaw an investigation and killed the victim to eliminate that threat. *State v. Copeland*, 928 S.W.2d 828, 850 (Mo. banc 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 981, 136 L.Ed.2d 864 (1997).

It is unclear on the record whether the plea court found the fifth aggravating circumstance, that Shafer committed the murders for the purpose of concealing or attempting to conceal a felony offense contained in chapter 195, RSMo 1994. On his Report of the Trial Judge required by

Rule 29.08(c), the plea court marked that he found this aggravating circumstance; however, the transcript from the plea and sentencing does not support this finding. It appears that the plea court inadvertently made this mark. Regardless, four aggravating circumstances are clearly supported by the evidence and, as we have said, only one valid statutory aggravating circumstance need exist to justify imposition of the sentence of death.

### Alleged Vague Uncharged Aggravating Circumstance

Shafer alleges that he was sentenced to death based on the sentencing court's consideration of the aggravating circumstance that the crime was "planned, outrageously vile, inhumane and involved torture." The plea court did not certify this as an aggravating circumstance. The plea court did not rely on this supposed aggravating circumstance in reaching a sentencing decision. The extent that the plea court said these words, they were mere surplusage.

### Consideration of Letters

■■■ Shafer now claims that the judge improperly considered, during sentencing, a letter that Shafer tendered to the judge just prior to the guilty plea and sentencing. The plea and sentence transcript show that the court considered a letter at sentencing. However, neither Shafer nor the plea court specified what letter was considered, how it was considered, or how such consideration was improper. Any claim of error is therefore waived. *State v. Isa*, 850 S.W.2d 876, 900 (Mo. banc 1993).

### Duplicative Aggravating Circumstances

Shafer claims that the aggravating circumstances filed by the state were impermissibly duplicative. This challenge has been addressed and rejected by this Court many times. *See, e.g., State v. Brown*, 902 S.W.2d 278, 293 (Mo. banc), *cert. denied*, 516 U.S. 1031, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995); *State v. Ramsey*, 864 S.W.2d 320 (Mo. banc), *cert. denied*, 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994). The points relating to aggravating circumstances are denied.

## VII.

### Alleged Improper Ex Parte Contacts

■■■ Shafer claims motion court error in failing to declare, *sua sponte*, that he was denied a fair trial due to improper *ex parte* contacts between the prosecutor and the judge. Shafer did not make this allegation in his motion to vacate or in his amended motion. The point is procedurally waived. *State v. Kreutzer*, 928 S.W.2d 854, 878 (Mo. banc 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997).

## VIII.

### Refusal to Disclose Personnel File

■■■ Shafer also assigns error to the motion court's refusal to order disclosure of public defender Paul Madison's personnel file. Absent establishing a basis for a claim that it contains material evidence, access to such a file is barred by law. SECTION 610.021, RSMo 1994; *State v. Parker* 886 S.W.2d 908, 916 (Mo. banc 1994), *cert. denied*, 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995).

First, since Shafer was intent on representing himself, the plea court told him specifically that he was waiving claims against past counsel for ineffective assistance of counsel by waiving counsel and pleading guilty. Shafer testified that he understood the waiver, and this claim is likewise waived. Second, at Shafer's post-conviction review, the motion court judge examined the file, *in camera*, and determined there was nothing in the file that required disclosure.

## IX.

### Alleged Brady Violation

■■■ Shafer claims the state withheld a police report allegedly signed by David Schramm (a former classmate of Steinmeyer) in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■■■ *Brady* requires the state to disclose evidence favorable to the accused when the evidence is material to guilt or to punish-

ment. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

The record reflects that Schramm recalled giving the police a statement shortly after the murders and signing "something." Schramm testified that his statement mainly described Steinmeyer's behavior in class the day after the murders—that he was inattentive and uncooperative.

The prosecutor produced the state's entire file and it contained no statement from Schramm. At the post-conviction review, the prosecutor stated that he did not believe a written statement by Schramm existed. Regardless, the information Schramm had to offer has now come to full light—and it was neither material nor relevant. No *Brady* violation exists. *See State v. Madsen*, 772 S.W.2d 656, 662 (Mo. banc 1989), *cert. denied*, 493 U.S. 1046, 110 S.Ct. 845, 107 L.Ed.2d 840 (1990).

The point is denied.

## X.

### Constitutionality of Rule 24.035

Shafer challenges, as have others before him, the unconstitutionality of the time limits of Rule 24.035. Once again we hold that the time limits of the rule are constitutionally firm and are mandatory. *See State v. Ervin*, 835 S.W.2d 905, 929 (Mo. banc 1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

The point is denied.

## XI.

### Proportionality Review

Section 565.035.3, RSMo 1994, requires this Court to determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence and the defendant.

### A.

After conducting our mandated independent review of the record, we find that the sentence of death was not imposed due to the influence of passion, prejudice or any other arbitrary factor.

### B.

The evidence necessary to support a finding of four statutory aggravating circumstances is beyond cavil, since it is the product of a constitutionally valid guilty plea.

### C.

In deciding whether the death sentence in this case is proportionate, we consider this case and similar cases where the death penalty was imposed. Here, Shafer sought out homosexual victims to rob. That was his planned entertainment for the night. After inflicting mortal wounds on his first victim, Shafer chased and shot his second victim as the victim begged for his life. Shafer coolly ended the lives of two men for an automobile, a hundred dollars, stereo equipment, a partial pack of cigarettes and a silver cigarette lighter.

This Court has upheld death sentences where the defendant murdered multiple victims, murdered for pecuniary gain or murdered for the purpose of eliminating possible witnesses. *State v. Parker* 886 S.W.2d 908, 916 (Mo. banc 1994), *cert. denied*, 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995); *State v. Griffin*, 756 S.W.2d 475 (Mo. banc 1988), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989); *State v. Murray*, 744 S.W.2d 762 (Mo. banc), *cert. denied*, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Schneider*, 736 S.W.2d 392 (Mo. banc 1987), *cert. denied*, 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988); *State v. Lingar*, 726 S.W.2d 728 (Mo. banc), *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987).

On a separate challenge, Shafer claims that his sentence is disproportionate to the sentence received by Steinmeyer. First, by Shafer's own admission, he shot the victims. Steinmeyer did not and did not expect Shafer to do so. Second, the sentence received by a co-conspirator is not to be considered by a trial court during sentencing. *State v. Schneider*, 736 S.W.2d at 396. Third, when this Court conducts a proportionality review, we do not compare cases in which the state did not charge a defendant with capital or first degree murder, where the defendant entered into a plea agreement with the state and pled guilty to a lesser crime, where the conviction was for a lesser offense than capital or first degree murder or where the state waived the death penalty. *State v. Bolder*, 635 S.W.2d 673, 685 (Mo. banc 1982).

We find Shafer's punishment neither excessive nor disproportionate.

## XII.

The judgment with respect to the conviction and sentence is affirmed; the judgment with respect to the post-conviction motion is affirmed in part and reversed in part.

BENTON, C.J., and PRICE, LIMBAUGH, COVINGTON, WHITE and HOLSTEIN, JJ., concur.

ROBERTSON, J., concurs in separate opinion filed.

ROBERTSON, Judge, concurring.

In his motion for rehearing, Shafer claims that this Court's initial opinion ignores his Rule 29.15 pleadings. He claims that those pleadings, read broadly, aver that he has a right to a presentence investigation and that the plea court's decision to sentence him to death without a knowing, intelligent and voluntary waiver of that right is prejudicial *per se*. The motion court agreed, expressly finding that Shafer had a right to a presentence investigation because of section 557.026.1, RSMo 1994, and that the plea court had failed to honor that right or seek a valid waiver of the right from Shafer.

The Court's opinion assumes without saying so that Shafer has the right to a presentence investigation that he claims, but determines that his pleadings do not aver any facts that show prejudice. In the absence of a Rule 29.15 pleading stating a factual base for his claim of prejudice, Shafer's claim of a procedurally-defective waiver of the right to a presentence investigation is waived for purpose of post-conviction review. Although I agree with that analysis, it is unnecessarily contorted. Further, it invites a claim of effective abandonment (or ineffective representation) by Shafer's post-conviction counsel on the issue. Such claims have sometimes found a friendly audience in the federal system. *See Antwine v. Delo*, 54 F.3d 1357 (8th Cir.1995),

I prefer to decide this issue in a more straightforward way.

First, there is no constitutional right to a presentence investigation and report.

Second, there is no statutory right to a presentence investigation. Section 557.026.1, RSMo 1994, provides:

When a probation officer is available to any court, such probation officer shall, ***unless waived by the defendant***, make a presentence investigation in all felony cases and report to the court before any authorized disposition under section 557.011.

(Emphasis added.)

The legislature initially adopted this language in 1978, to take effect January 1, 1979, and readopted the language in 1986. Rule 29.07(a)(1) states:

When a probation officer is available to the court, such probation officer shall, ***unless otherwise directed by the court***, make a pre-sentence investigation and report to the court before the imposition of sentence or the granting of probation.

(Emphasis added.) This Court initially adopted Rule 29.07(a)(1) in this form in 1979, effective January 1, 1980, and again adopted the Rule in 1988. The Court has authority to "establish rules relating to practice, procedure and pleading for all courts ... which shall have the force and effect of law." Mo. Const. art V, sec. 5.

Both section 557.026.1 and Rule 29.07(a) each claim to establish a procedure by which a sentencing court may (or may not) avail itself of additional information about the defendant prior to imposing a sentence. Neither the statute nor the rule establish a duty in the court to obtain a presentence investigation. Neither the statute nor the rule establish a right in the defendant to have a presentence investigation. The probation officer must be available "to the court", not the defendant. Were not the issue addressed in both the statute and the Rule procedural, this Court would have no authority to adopt Rule 29.07(a) *ab initio*. This is because, as previously noted, our constitutional authority is limited to establishing "rules relating to practice, procedure and pleading."

*State v. Phroper*, 619 S.W.2d 83, 91 (Mo. App.1981), properly concludes that the statute and the rule are procedural and are at loggerheads. Under Rule 29.07(a), a sentencing court's decision to dispense with a presentence investigation is sufficient to terminate the need for such an investigation and report, irrespective of the defendant's wishes. When a statute is addressed and contradicted by a subsequent procedural rule of this Court, the rule prevails unless the legislature amends or annuls the rule "by a law limited to the purpose." Mo. CONST. ART. V, SEC. 5. No such law exists.

This Court has interpreted nearly identical language to make pre-sentence investigations discretionary with the sentencing court, not mandatory. As this Court has said, the language of the rule is "clearly authority for the court to make use of presentence investigation as discretion indicates." *State v. Maloney*, 434 S.W.2d 487, 496 (Mo.1968). *Accord Phroper*; *State v. Abram*, 634 S.W.2d 538, 540 (Mo.App.1982). To repeat: The presentence investigation is available to the sentencing court as a tool; it is not a right resident in the defendant. Therefore, a presentence investigation is required "unless otherwise directed by the court," RULE 29.07(a) and section 557.026.1 are a nullity.

I do not read Rule 29.07(a) to require the sentencing court expressly to direct the probation officer not to conduct a presentence investigation. Direction is given by way of acts and deeds as well as words. The decision of the sentencing court to proceed with sentencing without a presentence investigation is a clear, unequivocal direction to the probation officer that the trial court has exercised its discretion against receiving a presentence investigation and report. The plea court's decision to proceed without the presentence investigation may be reviewed, if at all, only for abuse of discretion and then only on direct appeal.

I would not reach the pleading issue upon which the Court's opinion turns. It is simply unnecessary to do so.