STATE of Missouri, Respondent,

v.

John ZINDEL, Appellant.

John ZINDEL, Appellant,

v.

STATE of Missouri, Respondent.

No. 78084.

Supreme Court of Missouri,
En Banc.

Jan. 23, 1996.

Deborah B. Wafer, Asst. Public Defender, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Traci J. Sanders, Asst. Atty. Gen., Jefferson City, for respondent.

LIMBAUGH, Judge.

John Zindel appeals his conviction for first degree murder and armed criminal action and his sentence of life in prison without parole. The Court of Appeals, Eastern District, affirmed his conviction by order, without opinion, pursuant to Rules 30.25(b) and 84.16(b). This Court granted transfer. *Rules 30.27* and *83.03.* We now reverse and remand for a new trial.

I.

On Wednesday, February 20, 1991, John Zindel shot and killed Clarice Jablonski as she walked out of her house to her car on her way to church. This fact was not disputed by Zindel at trial. The only issue was Zindel's sanity.

Zindel and his wife resided with Zindel's mother in her home directly across the street from the Jablonski residence. They had moved there approximately five years earlier, shortly after the death of Zindel's father. Prior to the move, Jablonski and Zindel's mother maintained a friendship, but after the move, the relationship soured because of Zindel's increasing hostility toward the Jablonski family. No evidence exists that anyone in the Jablonski family ever did anything to provoke Zindel's hostility.

For several years prior to the shooting, Zindel manifested his hostility by directing profanity-laden diatribes at Jablonski or her son, Joel. These episodes were frequent, although unpredictable, and occurred only when both Zindel and one of the Jablonskis happened to be outside at the same time. In the months immediately preceding the killing, Zindel's conduct seemed to change for

the worse. For example, late in the summer of 1990, Zindel confronted Joel and a visiting friend and accused the friend of "looking at him funny" and "trying to start a fight." During this same time period, Joel once looked out of his window to discover Zindel outside staring in at him. Finally, during the fall prior to the shooting, Zindel constructed a tower with a spotlight on it, which he would shine into the Jablonski house at night. The spotlight was so powerful that it reflected off the Jablonski's house and into the windows of a neighbor's house. Again, no evidence exists that anyone in the Jablonski family did anything to provoke this behavior.

The offense in question took place while Jablonski was approaching her car with her ice scraping tools in hand. Zindel fired three shots from his garage. After being hit by the first shot, Jablonski began running towards her house. She was then hit by the other two shots and collapsed and died before reaching the door.

Two persons, Cindy Heede, a teenager on her way to school, and Joan Schlechtig, a neighbor of both Zindel and Jablonski, saw Zindel fire the shots from a rifle. After the shooting, witness Schlechtig saw Zindel put the rifle in the corner of the garage and close the garage door. At some point between the killing and the subsequent arrest, Zindel hid the murder weapon, a .22 caliber rifle, in an air-conditioning duct in the laundry room of his mother's house. When the police arrived at Zindel's house, they found him sitting in his living room with his wife and mother. They informed him that he was a suspect in the killing, handcuffed him, removed him from the house, took him to the patrol car and gave him *Miranda* warnings. At this point, Zindel refused to say anything to the police officers.

Zindel was then taken to the police station where the police again gave him the *Miranda* warnings and began to question him once he indicated a willingness to talk. Initially, Zindel denied his involvement in the murder. However, when police informed him about the existence of the witnesses, Zindel muttered some derogatory comments

about the victim, and said he did not want to talk anymore and wished to have an attorney present. The police then stopped the questioning.

As stated, at trial Zindel did not dispute that he caused the death of Jablonski. He claimed, however, that he was not responsible for his conduct under § 552.030.1, RSMo 1986, which states:

A person is not responsible for criminal conduct if, at the time of such conduct, as a result of a mental disease or defect he did not know or appreciate the nature, quality, or wrongfulness of his conduct or was incapable of conforming his conduct to the requirements of the law.[1]

Two psychiatrists and a psychologist testified at trial about Zindel's mental condition at the time of the killing. The court-appointed psychiatrist, Dr. Sam Parwatikar, testified that Zindel suffered from cortical atrophy, which was not consistent with his age, as well as two different types of organic brain disorder: dementia, meaning a general impairment of memory; and delusional disorder, meaning beliefs that are not amenable to reason. Dr. Parwatikar concluded, therefore, that at the time of the offense Zindel was unable to conform his conduct to the requirements of the law, although he did know that it was wrong to shoot someone.

The defense expert, Dr. William O'Connor, a psychologist, testified that Zindel was brain damaged and suffered from primary degenerative dementia with psychotic features. Dr. O'Connor concluded that Zindel would have had "serious impairments in his capacity to appreciate the offense" and that he could not conform his actions to the requirements of the law.

On the other hand, the state's expert, Dr. Stephen Dinwiddie, a psychiatrist, testified that Zindel suffered from delusional disorder of the paranoid type, meaning that he held odd beliefs that were not based on reality, but that the disorder was not associated with social deterioration or loss of function. Dr. Dinwiddie found no organic component to the disorder and found that Zindel could both

---

1. Section 552.030.1 has been amended and no longer contains the phrase, "or was incapable of conforming his conduct to the requirements of the law." § 552.030.1, RSMo 1994.

appreciate the nature and quality of his action and conform his conduct to the requirements of the law.

The jury found Zindel responsible for his conduct and found him guilty of first degree murder and armed criminal action. On appeal Zindel raises three points: (1) whether plain error occurred because of the prosecutor's use of the defendant's post-arrest silence; (2) whether plain error occurred when the prosecutor contended during closing arguments that Zindel "needed to go to jail for the rest of his life;" and (3) whether Zindel's counsel was ineffective for failing to object to the prosecutor's statements during closing argument. Because we find the first point persuasive, we need not reach either of the last two points.

## II.

■ A key element of the prosecutor's theory of the case was the inference from Zindel's post-*Miranda* silence that Zindel understood the nature and quality of his actions and could, when he wanted to, conform his conduct to the requirements of the law. In short, the prosecutor equated silence to sanity. In *Wainwright v. Greenfield*, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1985), the United States Supreme Court held that it is "fundamentally unfair" and thus a violation of due process to use the accused's post-*Miranda* silence as evidence of sanity. *Id.* at 295, 106 S.Ct. at 640–41. This prohibition includes "the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." *Id.* at 295 n. 13, 106 S.Ct. at 640 n. 13. In view of *Wainwright*, the state has conceded that the admission of evidence of Zindel's post-*Miranda* silence violated his due process rights. However, the state, noting that no objection was made to the evidence, disagrees that the violations constitute plain error. A claim of plain error lies only where there are "substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted'." *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995); *Rule 30.20*. Manifest injustice is dependent upon the facts and circumstances of the particular case. *State v. Nolan*, 872 S.W.2d 99, 103 (Mo. banc 1994).

The party asserting plain error has the burden to show manifest injustice. *State v. Wise*, 879 S.W.2d 494, 520 (Mo. banc 1994). There is ample authority that improper use of post-*Miranda* silence may constitute manifest injustice and therefore, plain error. *See e.g. State v. Stuart*, 456 S.W.2d 19, 22 (Mo. banc 1970); *State v. Flynn*, 875 S.W.2d 931, 934 (Mo.App.1994); *State v. Mabie*, 770 S.W.2d 331, 335 (Mo.App.1989).

■ To determine whether manifest injustice exists, it is necessary to review in some detail the manner and extent to which the improper evidence was used. In this regard the record reflects that the prosecutor emphasized this evidence at every point, from opening statement through the testimony of the witnesses and, finally, in closing argument.

In opening statement the prosecutor said: And they take him into custody and advised him of his rights and he indicated at that point in time he did not choose to make a statement. He was subsequently taken down ... to Homicide where he was again advised of his rights. And he indicated he knows nothing about ay [sic] shooting that he had nothing to do with any shooting and when confronted with the facts he was identified by two people who saw him shooting, he said some comment about that.... And then he declined to make any further statement and requested an attorney which is his right to do.

In his case-in-chief, the prosecutor questioned Officer Joseph Brauer, one of the first officers on the scene, as follows:

Q. When you removed him from the police unit, was he informed by you or someone else in your presence what he was being arrested for?

A. He was.

Q. And what was he told and who told him?

A. My partner did it, Detective Nickerson and in my presence said he was being charged with Murder and advised him of his Constitutional Rights of which he nodded his head and indicated that he understood.

Q. What did he say then?

A. He stated that he did not want to say anything at that time.

Q. He said I don't want to say anything to you fellows?

A. He said I don't want to talk.

Q. You didn't make him talk, did you?

A. No, I did not.

Subsequently, the prosecutor questioned Detective Chris Pappas about statements Zindel made while in the police station about three hours after the shooting. After testimony that Pappas read the *Miranda* warnings to Zindel, who indicated that he understood them, the examination then proceeded:

Q. What form did that indication take, verbally or what?

A. He verbally said he understood his rights and understood them very clearly.

Q. And did he choose at that point to make a statement?

A. Yes, sir.

Q. What was his statement that he gave you at that point?

A. Well, when the conversation began we informed him that we had two witnesses who had given statements indicating what he had done as far as shooting the rifle from his garage.

Q. Let's back up. Before you told him that did he say, what did he say about the shooting, you told him he's being charged with a Murder and what did he say immediately?

A. He initially denied it.

    .        .        .        .        .  .

Q. Now did he stop that conversation at some point in time?

A. Yes, he did.

Q. How did he stop it. What did he say?

A. He informed myself and Detective Kahlen he didn't want to answer any more questions. He said that if he was going to talk any more he would want an attorney there on his behalf and at that point in time we ended all questioning.

Q. Because you didn't have an attorney there for him?

A. Yes, that's correct.

Q. No question that's what he said. He didn't want to talk any more. I want an attorney, if I'm going to talk?

A. Yes.

Q. Did he mumble that, did he, you know, did you clearly understand what he was saying when he said it?

A. I clearly understood it.

Q. You didn't have any problem understanding him?

A. No, sir.

Q. And apparently in response to your advising of his rights and questioning he didn't have any problems he did that and indicated?

A. No, sir, he told us very clearly he was very attentive during our interview and he didn't have any problem when he invoked his Constitutional Rights. We ended all questioning.

Later, during Zindel's case-in-chief, the prosecutor cross-examined Dr. Parwatikar, the court-appointed psychiatrist, as follows:

Q. ... Would you find it significant when advised by the police of his rights, Constitutional Miranda Rights, you dont' [sic] have to say anything that can be used against you, would it surprise you to know that he said I don't want to make a statement?

A. I wouldn't find it surprising at all.

    .        .        .        .        .

Q. Would it surprise you when he is told there are two eyewitnesses who saw you shoot the lady, he says well I don't want to talk about it any further. I want a lawyer, would it surprise you?

    .        .        .        .        .

WITNESS: I wouldn't be surprised even if he said it, but I don't believe he did say that.

MR. MOSS: Aren't those all normal reactions to not doing the right thing under the law. You know I'm not going to talk about it, and denying I had anything to do with it and asking for an attorney when you know the people are trying to pin it on you?

A. Absent his cortical atrophy, and behavior description, I would agree, absent those two things.

Next, the prosecutor cross-examined Dr. O'Connor, the defense expert:

Q. But what he does say, when the police hauled his fannie out the door and say here are your rights today. He says I don't think I want to talk right now.... We're talking about right there, pulling him out the door, he says I don't want to talk about it right now?

A. I don't know what he said but I know he asked for a lawyer.

Q. Right then though, he said I don't want to talk, doesn't it show some appreciation, presence of mind, what is going on?

A. He shows, he is being guarded and he gives evasive and paranoid and some presence of mind. I don't think I used the word appreciate because it has a legal meaning.

Q. Isn't that behavior you expect of any guy that's being arrested for a robbery or a rape or a murder, he might have the normal response and would be when the cops are pulling you in handcuffing you, you think, I don't want to talk to you guys?

A. Sure, I think it's a point well-taken.

Q. Could we say he exhibited a normal response then?

A. Yes, you could say he might have.

Q. He did not exhibit any delusional response then?

A. I don't know what was in his mind, but that sounds perfectly logical.

.     .     .     .     .

Q. When they say okay, we have two witnesses saw you do it, don't give us that, tell us why you did it, and he says well, he never did like the lady and she was spreading rumors about me being a thief and you know, well now I really don't think I should talk anymore and I want a lawyer?

A. Pretty smart behavior at the moment.

.     .     .     .     .

Q. So he is making some reasonably good choices within an hour of when he makes the unreasonably bad choice to shoot and kill somebody across the street?

A. Yes.

Then in rebuttal, the prosecutor questioned the state's expert, Dr. Dinwiddie, as follows:

Q. So basically what is your final, you know your testing, your conclusions, ... Did you find anything significant about ... [Zindel's] ... conversing with the police and declining to make a statement initially and acknowledging his rights, acknowledging a consent to search form.... Did you consider all of those things?

A. Yes, I did.

Finally, during closing argument the prosecutor argued:

[The police say you're] under arrest for the murder of Mrs. Jablonski, your neighbor across the street. Here's your rights, you have rights, you have the right to remain silent and the right to have your attorney present, do you want to waive your rights. I don't think I want to talk to you at this time.... They get downtown and advise him of his rights again.... Then he says what, I don't think I'm going to talk anymore unless I have an attorney and have an attorney before I talk to you any more. That's a perfectly reasonable response that he makes, so what I am saying to you is how do you judge whether or not a mental disease or defect even if he has one, is operating to cause him to do something bad....

The entire purpose of this testimony and argument is to demonstrate that Zindel's post-*Miranda* silence and request for counsel is lucid and reasonable behavior, in total contradiction of Zindel's claim of insanity. Indisputably, it is just such conduct by the prosecutor that *Wainwright* prohibits. Considering that admission of Zindel's post-*Miranda* silence was a constitutional violation, that the evidence pertained to the central issue in the case, and that the prosecutor repeatedly drove home the evidence in an effort to sway the jury, we conclude that manifest injustice occurred.

On appeal, the state contends that the jury would not have been affected by the fact of Zindel's post-*Miranda* silence because of the abundance of expert testimony on the issue of Zindel's sanity. In other words, the state views the case as nothing but a battle of

experts. We do not agree. All three experts stated that Zindel was suffering from some type of mental disease or defect. Two of the three, including the court-appointed psychologist, contended that the defendant could not conform his conduct to the requirements of the law. Only the state's expert disagreed with that assessment. Given the controversy among the experts, the anecdotal evidence concerning Zindel's behavior both before and immediately after the death of Jablonski would have had great weight with the jury. Furthermore, the prosecutor's theory of the case at trial is inconsistent with the state's argument on appeal, because the prosecutor's constant references to Zindel's post-*Miranda* silence clearly indicate that he believed that it would indeed have great weight with the jury.

The state also argues that defense counsel's failure to object to the evidence of post-*Miranda* silence may have been part of trial strategy. In this case, it is impossible to perceive any strategic reason why defense counsel would allow a prosecutor to admit and repeatedly refer to this damaging evidence, knowing that the evidence was constitutionally prohibited.

For the reasons stated above, the judgment is reversed and the case is remanded for new trial.

HOLSTEIN, C.J., BENTON, PRICE, ROBERTSON and COVINGTON, JJ., and SHANGLER, Senior Judge, concur.

WHITE, J., not sitting.