**STATE of Missouri, Respondent,**

v.

**Gary W. BLACK, Appellant.**

No. SC 82279.

Supreme Court of Missouri, En Banc.

July 10, 2001.

Rehearing Denied Aug. 21, 2001.

Rosemary E. Percival, Asst. Public Defender, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for Respondent.

BENTON, Judge.

Gary W. Black was convicted of first-degree murder and sentenced to death. This Court has exclusive jurisdiction of the appeal. *Mo. Const. art. V, sec. 3.* Affirmed.

On the evening of October 2, 1998, Andrew Martin, Mark Wolfe and victim Jason O. Johnson met at a Joplin restaurant. After eating dinner and drinking beer, they decided to go to a downtown nightclub. Martin and the victim got into Martin's 1996 Ford F–150 pickup, while Wolfe followed in his Camaro. En route, they stopped at a convenience store. Martin and Wolfe remained in their vehicles while the victim entered the store and purchased a 40–ounce bottle of beer and a can of chewing tobacco. While in line, the victim stood behind Tammy S. Lawson. The jury viewed a tape of the victim and Lawson together in line.

Lawson was the girlfriend of defendant Gary W. Black, who was also parked outside the store. When the victim exited the store, Lawson pointed him out to the defendant. (During the penalty phase, Lawson testified that she was upset and told defendant that the victim made "a pass" at

her.) The victim and Martin then left the store in the pickup, with Wolfe following in his Camaro. Defendant and Lawson were in defendant's car, close behind the Camaro.

When Martin stopped at the stoplight at 5th and Joplin, defendant pulled alongside in the right lane. Defendant began to "exchange words" with the victim. Defendant got out of his car, reached through the passenger window of the pickup, and stabbed the victim in the neck, nearly severing his carotid artery and completely severing his jugular vein.

Defendant immediately returned to his car. Victim left the pickup, staggered over to defendant's car, and threw the bottle of beer at him. It is unclear whether the bottle struck defendant. (It did become clear during penalty phase that leaving the scene, defendant commented, "One nigger down," and threw the knife out the car window.) Defendant then fled to Oklahoma.

The stab wound—4.5 to 6 inches deep—bled profusely. Bystanders attempted to slow the bleeding with clothing and towels. Paramedics arrived to find the victim unresponsive, from massive blood loss. Blood drained into the victim's airway, depriving him of oxygen. The victim died three days later.

Defendant was arrested in Oklahoma on a Missouri warrant. During inventory, police found an empty knife sheath in his car. Based on a statement by Tammy Lawson, an officer found the knife in a grassy area near a cemetery, about 20 blocks from the crime scene.

After deliberating less than two hours, the jury found defendant guilty of first degree murder. The jury later recommended the death penalty, finding two statutory aggravators—prior serious assaultive convictions and depravity of mind. The trial court sentenced the defendant to death.

## I.

■ Defendant argues that the trial court clearly abused discretion in refusing a one-day continuance when one attorney was sick and unable to conduct the death qualification part of voir dire.[1] The attorney who did conduct it, defendant contends, was unprepared. Defendant further asserts a violation of a guideline that a capital defendant be represented by two qualified attorneys at every stage. See Guideline 2.1, *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (1989 ed.); *Rule 29.16.*

In fact, defendant was represented by two attorneys at every stage, including voir dire. (Another attorney served as second chair in place of the sick attorney.) A principal attorney conducted the voir dire, including the death qualification. The court refused a continuance because that attorney was "capable and experienced counsel in this sort of case," as confirmed by her own statements.

■ Continuances are within the sound discretion of the trial court, and a "very strong showing" is required to prove abuse. *State v. Schaal*, 806 S.W.2d 659, 666 (Mo. banc 1991), *cert. denied*, 502 U.S. 1075, 112 S.Ct. 976, 117 L.Ed.2d 140 (1992). Because the trial court found this principal attorney capable and experienced, it did not abuse discretion denying a continuance.

---

1. In nearly every point of error, defendant claims denial of his rights to due process of law, fair trial, and freedom from cruel and unusual punishment, under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and article I, section 10, 18(a) and 21 of the Missouri Constitution.

## II.

### A.

According to defendant, the trial court should have admitted testimony that the victim died as a result of bad medical care, rather than defendant's attack. Specifically, defendant believes that the victim may have survived but for his physician's failure to administer the blood thinner Heparin.

■ In fact, the victim received the blood thinner Lovenox. According to defendant's own offer of proof, treating physician Dr. Meier was advised to administer Lovenox *or* Heparin, and administered Lovenox.

■ Any negligence of the victim's doctors is irrelevant if death is the proximate result of defendant's conduct:

> The unlawful act need not be the immediate cause of death. It is enough that it be a contributing proximate cause, although other contributing causes may have intervened.

*State v. Williams*, 652 S.W.2d 102, 111–12 (Mo. banc 1983). See also *State v. Bolder*, 635 S.W.2d 673, 680 (Mo. banc 1982), *cert. denied*, 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983) (immaterial whether victim died from an infection resulting from the stabbing, rather than from the stabbing itself).

In this case, both the treating physician and the pathologist testified that the victim died from the stab wound and the direct results of that stab wound. The trial court did not abuse discretion in refusing to admit irrelevant testimony of alleged improper medical care. See *State v. Simmons*, 944 S.W.2d 165, 178 (Mo. banc), *cert. denied*, 522 U.S. 953, 118 S.Ct. 376, 139 L.Ed.2d 293 (1997).

Defendant next asserts that evidence of malpractice is relevant to refute the prosecutor's argument that the wound's severity shows an intent to kill. On the facts here, this assertion is almost frivolous. Defendant stabbed the victim in the neck, inflicting a 4.5 to 6.0–inch deep wound, nearly severing a carotid artery and completely severing a jugular vein.

Defendant further alleges that malpractice testimony would counter evidence of the medical efforts to save the victim's life. This argument is not preserved for appeal, and as discussed, the adequacy of the victim's medical treatment is irrelevant.

■ Finally, defendant claims that malpractice evidence would impeach Dr. Meier, by showing his motive to exaggerate the victim's injuries. This argument is also not preserved for appeal. At any rate, the trial court properly exercised discretion in refusing to allow impeachment on an immaterial or collateral matter. See *State v. Wolfe*, 13 S.W.3d 248, 258 (Mo. banc), *cert. denied*, 531 U.S. 845, 121 S.Ct. 114, 148 L.Ed.2d 70 (2000).

### B.

Citing an inadequate foundation, defendant attacks the admission of Exhibit 10—the knife used to stab the victim. The foundation to admit the knife consisted of Sergeant Goodwin's testimony, Dr. Meier's testimony, and Exhibit 11—an empty knife sheath.

Sergeant Goodwin testified that after Tammy Lawson made a statement to the police, the Chief of Police told him to look for a knife in the grassy area near a specific cemetery. Defendant contends that by this double-hearsay, the State "back-doored" testimony without calling the witness during guilt phase. (During penalty phase, Lawson positively identified the knife, but she did not testify during guilt phase.)

▮ Defendant properly objected to the hearsay identification testimony. See *State v. Maxwell*, 502 S.W.2d 382, 395 (Mo.App.1973). While hearsay testimony is admissible to explain subsequent conduct, it is not admissible to prove the truth of the matter asserted. *State v. Leisure*, 796 S.W.2d 875, 880 (Mo. banc 1990). Lawson's statement—as repeated by Goodwin—was used for its truth: that Exhibit 10 was the murder weapon that defendant threw near the cemetery.

Dr. Meier testified that the knife blade that inflicted the victim's wound was 4.5 to 5.0–inches long and guessed that it was 1.0 to 1.5–inches wide. According to Meier, Exhibit 10 "could have" been the knife that wounded the victim. Meier did not testify that Exhibit 10 was distinguishable from any other non-serrated knife about 5 inches long and 1 inch wide. This consistency, coupled with Goodwin's hearsay, is inadequate foundation to admit Exhibit 10 as the murder weapon.

The knife sheath—admitted later in the trial—indicates the size and shape of a knife it might hold, but this again only shows a similarity to the murder weapon. Defendant separately objects to the admission of the sheath because its seizure occurred on American Indian land in Oklahoma. However, because defendant and victim are not of Native American descent, this special protection does not apply. *Solem v. Bartlett*, 465 U.S. 463, 465 n. 2, 104 S.Ct. 1161, 1163 n. 2, 79 L.Ed.2d 443, 447 n. 2 (1984).

▮ The trial court erred in finding that Sergeant Goodwin's testimony—with Dr. Meier's testimony and the admission of the knife sheath—was sufficient foundation to admit the knife as the murder weapon. However, in this case, the trial court's admission of the knife constitutes harmless error. See *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

▮ The test is whether the improper admission was outcome-determinative. *State v. Barriner*, 34 S.W.3d 139, 150 (Mo. banc 2000). When the prejudice from the improper admission of evidence is outcome-determinative, reversal is required. *Id.* A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all evidence properly admitted, there is a reasonable probability that the jury would have acquitted but for the erroneously admitted evidence. *Id.*

▮ A conviction may be reversed when a weapon admitted into evidence is unconnected to the crime and not similar to the weapon involved in the crime. See *State v. Wynne*, 353 Mo. 276, 182 S.W.2d 294, 300 (1944); *State v. Perry*, 689 S.W.2d 123, 125 (Mo.App.1985); *State v. Grant*, 810 S.W.2d 591, 592 (Mo.App.1991). This case is distinguishable from that line of cases because here the evidence during the guilt phase, particularly Dr. Meier's testimony, demonstrates that Exhibit 10 is similar to the weapon used to kill the victim. See *State v. Rehberg*, 919 S.W.2d 543, 551 (Mo.App.1995), citing *State v. Silvey*, 894 S.W.2d 662, 667–68 (Mo. banc 1995).

The evidence is overwhelming that defendant stabbed the victim. In fact, defense acknowledged the stabbing in closing argument but claimed self-defense. Because there is no reasonable probability that the jury would have acquitted but for the erroneously admitted evidence, the error in admitting the knife as the murder weapon is harmless beyond a reasonable doubt.

## C.

### 1.

Defendant claims that the trial court erred in refusing to let his counsel display a standard ruler to the jury during closing argument. According to defendant, the ruler would demonstrate that Dr. Meier exaggerated the severity of the wound.

■ The trial court has broad discretion to admit or reject demonstrative evidence. *State v. Holmes,* 609 S.W.2d 132, 135–36 (Mo. banc 1980). The court did not abuse discretion in refusing to admit the ruler. The jury did not need a ruler to determine the credibility of Dr. Meier, as the lengths of 4.5 and 6.0 inches are within the common knowledge of jurors. See *State v. Clark,* 926 S.W.2d 194, 197 (Mo.App.1996).

### 2.

During guilt-phase closing argument, defense counsel showed the jury a 40–ounce bottle to demonstrate its potential as a weapon. The State objected that the bottle was not admitted into evidence, nor similar to the victim's bottle. The trial court sustained the objection and instructed the jury to disregard the display. Defendant appeals, alleging the demonstration was critical to defendant's self-defense argument.

■ The trial court has broad discretion in controlling closing argument, and its rulings are reversed only for an abuse of discretion prejudicing the defendant. *State v. Ferguson,* 20 S.W.3d 485, 498 (Mo. banc 2000). Because counsel used an item outside the evidence in order to dramatize what was adequately described by testimony, the trial court properly refused the argument and demonstration. *State v. Booker,* 631 S.W.2d 854, 857 (Mo. banc 1982).

### 3.

Defendant contends the prosecutor argued facts not in evidence and impermissibly referred to excluded evidence. During guilt-phase rebuttal, the prosecutor said: "[Defendant] deliberated every inch of the way, because in his mind a black man had the audacity to inadvertently touch his girlfriend." Defendant objected to "facts not in evidence." The court told the jury to "endeavor to recall the testimony," and directed the prosecutor, "Try to stay within the testimony."

Then, four transcript pages later, the prosecutor stated:

> The fact of the matter is poor Jason Johnson is dead today because he was a black man in the wrong place at the wrong—
>
> [Objection to] "facts not in evidence."
>
> [Overruled by Court.]
>
> In the wrong place at the wrong time, and he's now paid with it, ultimately, with his life.

■ From the evidence, a party may argue inferences that are supported by the facts. *State v. Barton,* 936 S.W.2d 781, 783 (Mo. banc 1996). While defendant's racial epithets were not admitted until the penalty phase, race evidence was presented during guilt phase. The victim's race, defendant's race, the girlfriend's race, and the taped encounter at the store were all in evidence. The prosecutor may argue inferences from the evidence.

### 4.

■ Defendant urges as plain error that the trial court did not *sua sponte* order a mistrial when the prosecutor argued, without objection, that the victim died of his stab wounds. Because defendant was prohibited from presenting evi-

dence that medical error caused victim's death, defendant believes that the prosecutor impermissibly commented on excluded evidence. Defendant waived this claim by not objecting at trial. *State v. Parker*, 886 S.W.2d 908, 922–23 (Mo. banc 1994). Moreover, the proposition that medical error caused the victim's death was not clearly supported by defendant's own offer of proof. Thus, the trial court properly refused to declare a mistrial when the prosecutor argued that the victim died from being stabbed in the neck by defendant.

### D.

Defendant challenges, as plain error, the trial court's failure to *sua sponte* instruct on lesser-included offenses. Contending that the facts support voluntary manslaughter or second-degree murder, defendant argues that lesser-included-offense instructions are required in capital cases. See *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

■■■ Defendants may waive the giving of lesser-included-offense instructions. *State v. Ervin*, 835 S.W.2d 905, 922 (Mo. banc 1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993), citing *Spaziano v. Florida*, 468 U.S. 447, 456–57, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). Foregoing such instructions may be trial strategy. *Id.* Because defendant did not specifically request lesser-included-offense instructions, the trial court did not plainly err in not giving such instructions. *State v. Fowler*, 938 S.W.2d 894, 898 (Mo. banc 1997); *State v. Dexter*, 954 S.W.2d 332, 344 (Mo. banc 1997).

■ To find plain error, the trial court must have "so misdirected or failed to instruct the jury as to cause manifest injustice or miscarriage of justice." *Fowler*,

938 S.W.2d at 898. As discussed in the next section, ample evidence of deliberation was presented.

### E.

■ Defendant claims insufficient evidence that defendant "deliberated" before stabbing the victim—as required for a first-degree murder conviction. *Section 565.020.1* RSMo 2000.[2] Review is limited to whether there is sufficient evidence for a reasonable juror to find guilt beyond a reasonable doubt. *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). The evidence, together with all reasonable inferences, is viewed in the light most favorable to the verdict. *State v. Clemmons*, 753 S.W.2d 901, 904 (Mo. banc), *cert. denied*, 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988).

■ Defendant followed the victim for over a mile, for nearly 10 minutes, before getting out of his car, walking over to the victim, reaching through the window, and stabbing him in the neck. Deliberation is cool reflection for any length of time, however brief. *Section 565.002(3)*. In *Clemmons*, "the evidence that defendant had to take a few steps" toward the victim before stabbing him "gives rise to the reasonable inference that defendant reflected for at least the time it took" to reach the victim. 753 S.W.2d at 906; see also *State v. Smith*, 781 S.W.2d 761, 764–65 (Mo. banc 1989), *vacated on- other grounds* 495 U.S. 916, 110 S.Ct. 1944, 109 L.Ed.2d 306, *reaffirmed*, 790 S.W.2d 241 (Mo. banc), *cert. denied*, 498 U.S. 973, 111 S.Ct. 443, 112 L.Ed.2d 426 (1990). Here, defendant took more then a few steps to reach the victim. Reasonable jurors can infer deliberation from all the circumstances. *State v. Johnston*, 957 S.W.2d 734, 747–48 (Mo. banc 1997), *cert. denied*,

---

**2.** Unless indicated otherwise, all statutory citations are to RSMo 2000.

522 U.S. 1150, 118 S.Ct. 1171, 140 L.Ed.2d 181 (1998).

## III.

### A.

Five days before trial, defendant requested to waive his Sixth Amendment right to be present at trial. The prosecutor objected. Two days later, the trial court ordered defendant to be present. Defendant was present for the guilt phase, except for the instruction conference.

Once found guilty, defendant again requested to be absent. In response to the court's questions, defendant stated that his decision was knowing and voluntary. The trial court granted his request; defendant was absent from all the penalty phase. His attorney reiterated his desire to be absent the second day of penalty phase.

According to defendant, the trial court erred in accepting his waiver of presence at the penalty phase, and in not requiring him to personally waive his presence again on the second day. Defendant asserts similar error in his counsel's waiver of his presence at the instruction conference. Because these claims are not preserved, defendant must demonstrate plain error: that "substantial grounds" exist for believing that "manifest injustice" occurred. *State v. Zindel,* 918 S.W.2d 239, 241 (Mo. banc 1996).

Under oath, defendant waived his right to be present "voluntarily and knowingly." He now contends his absence reflected poorly on him during the penalty phase. This Court will not second-guess defendant, but reviews only whether his decision was voluntary and knowing. Defendant himself admits it was.

As for defendant's absence the second day of penalty phase, his purposeful absence creates the presumption of a valid waiver. *State v. Johns,* 34 S.W.3d 93, 116 (Mo. banc 2000); *State v. Knese,* 985 S.W.2d 759, 776 (Mo. banc), *cert. denied,* 526 U.S. 1136, 119 S.Ct. 1814, 143 L.Ed.2d 1017 (1999). Tellingly, defendant never alleges that he was prevented from appearing, or that his absence was anything but intentional. Rather, he contends that the trial court erred by relying on his waiver, and not requiring him to renew it personally. The trial court properly relied on the representation of defendant's attorney.

Defendant contends that the trial court erred in holding the instruction conference without him and with only his counsel's waiver of his presence. The law is settled that counsel may waive defendant's presence at an instruction conference. *Annotation: Exclusion or absence of defendant, pending trial of criminal case, from courtroom, or from conference between court and attorneys, during argument on question of law,* 85 ALR 2d 1119 (1962, Supp.1991, 2001); *State v. Middleton,* 998 S.W.2d 520, 524–26 (Mo. banc 1999), *cert. denied,* 528 U.S. 1167, 120 S.Ct. 1189, 145 L.Ed.2d 1094 (2000).

### B.

Defendant contends that the trial court should have permitted impeachment of penalty-phase witness Deputy Robert Saltkill. Saltkill, a jail employee at the time, testified that defendant attacked him after walking into an off-limits area. According to defendant's offer of proof, Saltkill was fired because drugs were found in his car while parked at the jail. The court correctly refused this offer of proof because, generally, one may not impeach a witness with evidence of an arrest, investigation, or criminal charge that has not resulted in a conviction. *State v. Wolfe,* 13 S.W.3d at 258. Defendant offered no evidence of a conviction.

The general ban on impeachment by prior, unconvicted misconduct has three exceptions: 1) a specific interest, 2) a possible motivation to testify favorably for the State, or 3) testimony given with an expectation of leniency. *Id.* Defendant now alleges that his inquiry would show Saltkill's motive to testify favorably for the State, in order to curry favor with his employer. This ground was not preserved for appeal. *State v. Nettles,* 10 S.W.3d 521, 528 (Mo. App.1999). Rather, by the offer of proof, the unconvicted act was to generally impeach Saltkill's credibility. Because it did not fall within any of the three exceptions, the judge properly refused the offer of proof.

Finally, defendant argues that by not explaining why Saltkill left his position in the jail, jurors may speculate he left due to fear, or the injuries defendant inflicted. This ground is also not preserved for appeal, and does not constitute plain error. *Rule 30.20.*

## C.

### 1.

Defendant asserts that the prosecutor misstated the statutory aggravators during penalty-phase closing argument.

[Prosecutor]: And if you're firmly convinced that the State of Missouri has proven these aggravators to you beyond a reasonable doubt then we are requesting and you are entitled to return your penalty of death.

[Defense attorney]: Your Honor, I'm going to object. There's other instructions that are to be read before a sentence is imposed. I think that's misleading.

. . . .

[The Court]: I don't understand your comment that there are other instruc-

tions to be read. I don't know of any other instructions to read at this point.

[Defense Attorney]: No, the jury reads other instructions. They don't stop at the aggravators.

[Prosecutor]: I didn't suggest that they did.

(The proceedings returned to open court.)

[The Court]: You may proceed.

■ The prosecutor did not argue that the jurors were required to impose the death penalty, or not to consider mitigating factors. In context, the prosecutor commented that finding an aggravating circumstance was a threshold to imposing the death penalty. See *State v. Shafer,* 969 S.W.2d 719, 739 (Mo. banc), *cert. denied,* 525 U.S. 969, 119 S.Ct. 419, 142 L.Ed.2d 340 (1998).

■ The trial court has broad discretion in controlling closing argument, and rulings are reversed only for abuse of discretion prejudicing the defendant. *State v. Ferguson,* 20 S.W.3d at 498. The court acted within its discretion, and further, there is no prejudice. Following the prosecutor's statement, defendant's attorney outlined each step necessary to recommend death, explaining to the jury the role of aggravating and mitigating circumstances.

### 2.

According to defendant, the prosecutor mischaracterized the "depravity of mind" aggravator by encouraging the jury to find it based on a racial hate crime:

[Prosecutor]: One of the things you must find is that this death was outrageously and wantonly vile, horrible and inhuman. What could be more outrageously and wantonly vile, horrible and

inhuman than being killed because of your race—

[Defense attorney]: Objection.

[Prosecutor]:—because you're black?

[Court]: The jury will understand that it must be guided by the evidence and disregard any argument outside of the evidence. You may proceed.

[Prosecutor]: Thank you, Your Honor.

[Defense attorney]: Your Honor, if I could further that objection, it's a misstatement of the aggravator and a misstatement of the law. That is not the aggravator.

[Court]: The jury should, of course, refer to the instructions. The objection will be overruled.

■ The State concedes that the depravity-of-mind aggravator was improperly submitted. Because only one valid statutory aggravator is needed to consider imposition of the death penalty, a defective additional aggravator usually affords no basis for relief. *State v. Shafer*, 969 S.W.2d at 739; *section 565.032.1(1)*.

■ Defendant believes that the prosecutor's argument was critical in the jury's decision on punishment. In the penalty phase, the jury has a choice between two sentences: death and life imprisonment. *State v. Shurn*, 866 S.W.2d 447, 463 (Mo. banc 1993). Errors during the penalty phase can prejudice the defendant by preempting the jury from choosing the "life" alternative. *Id.* Thus, this Court may review alleged errors during the penalty phase, even if the jury finds another aggravator.

Here, there is no prejudice. Tammy Lawson testified to the racist motive for the killing, including defendant's racist comments before and after the stabbing. In determining "whether the evidence as a whole justifies a sentence of death or a sentence of life imprisonment without eligi-

bility for probation, parole, or release except by act of the governor," the jury "shall consider *all evidence* which it finds to be in aggravation or mitigation of punishment." *Section 565.032.1(2)* (emphasis added.) Moreover, "each juror shall consider *any evidence* which he [or she] considers to be aggravating or mitigating." *Id.* (emphasis added.) The penalty-phase evidence of racial motivation factually supported the prosecutor's argument.

### 3.

■ Defendant next alleges that the prosecutor: 1) implied personal knowledge and, 2) improperly vouched that death was the proper sentence. This occurred during penalty-phase argument, when the prosecutor commented, "I realize the magnitude of the decision that you have to make, because I had to make it first."

■ Prosecutors may not assert personal knowledge of facts in issue, which essentially is unsworn testimony. *Bucklew v. State*, 38 S.W.3d 395, 400 (Mo. banc 2001). Here, the prosecutor did not imply special knowledge, but made a rhetorical argument based on the evidence. See *id.* This Court has found that a prosecutor's comment—"it's not an easy decision" to ask for the death penalty, "[b]ut we make it in this case"—did not imply the prosecutor had personal knowledge outside the evidence. *State v. Mease*, 842 S.W.2d 98, 109 (Mo. banc 1992), *cert. denied*, 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993). Likewise, special knowledge is not implied here by comments on the enormity of the jury's decision.

■ For the first time on appeal, defendant claims that the prosecutor personally vouched by saying: "I realize the magnitude of the decision that you have to make, because I had to make it first." The prosecutor may express an opinion,

fairly drawn from the evidence, that the death penalty is appropriate. *Id.* at 109. Defendant invokes *Shurn v. Delo*, 177 F.3d 662, 665–66 (8th Cir.1999). However, in *Shurn,* the prosecutor's argument was "filled with improper statements," including linking the defendant to mass murderers like Charles Manson and urging the jury to "kill Daryl Shurn." *Id.* The alleged vouching does not constitute plain error resulting in manifest injustice. *Rule 30.20.*

### D.

Defendant contends that the depravity-of-mind aggravator is not supported by evidence, and is unconstitutionally vague. Asserting that the victim's death was not an "exceptional murder," defendant claims he acted, not with depravity of mind, but rather in the heat of passion when the victim "sexually accosted" defendant's live-in girlfriend. Further, he claims the aggravator is so vague as to be a meaningless catchall.

■ The State concedes that insufficient evidence supported this statutory aggravator. This does not, however, require reversal of the sentence. The jury found defendant had prior serious assaultive convictions—another aggravating circumstance. One statutory aggravating circumstance may support a sentence of death. *State v. Shafer*, 969 S.W.2d at 739; *section 565.032.1(1)*. Moreover, as discussed, the jury shall consider "all evidence" and "any evidence" which it finds in aggravation or mitigation. *Section 565.032.1(2)*.

■ Defendant next objects that the judge, rather than the jury, determined that defendant's prior convictions were serious and assaultive. As a matter of law, the judge may determine whether the prior convictions are serious and assaultive. *State v. Taylor*, 18 S.W.3d 366,

377–78 (Mo. banc 2000). Defendant challenges this well-settled principle by invoking *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). *Apprendi* does not invalidate capital sentencing schemes that require judges to find specific aggravating circumstances. 530 U.S. at 496–97, 120 S.Ct. at 2366, 147 L.Ed.2d at 459; *State v. Johns,* 34 S.W.3d 93, 114 n. 2 (Mo. banc 2000).

■ Defendant further argues that the trial court erred in separately submitting his prior convictions for felonious assault and armed robbery, because the jury could believe that they occurred on two different dates. This argument was not preserved for appeal, and also fails on the merits. The trial court properly listed the defendant's convictions separately. *State v. Harris,* 870 S.W.2d at 812.

### IV.

■ Defendant alleges that his death sentence is disproportionate. Under section 565.035, this Court determines: 1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; 2) whether the evidence supports a statutory aggravating circumstance and any other circumstances found; 3) whether the sentence of death is excessive or disproportionate to the penalty in similar cases, considering the crime, the strength of the evidence, and the defendant.

As for passion, prejudice, or other arbitrary factors, the defendant re-asserts the points argued on appeal. As discussed above, defendant's points do not show passion, prejudice or other arbitrary factors.

The jury found that the defendant met the statutory aggravating factor of serious assaultive convictions—armed robbery and felonious assault. This Court has affirmed sentences of death where the defendant

had a history of prior convictions similar to the defendant: *State v. Amrine*, 741 S.W.2d 665, 672 (Mo. banc 1987) (defendant had two prior serious assaultive felonies, for first degree robberies); *State v. Reuscher*, 827 S.W.2d 710, 715 (Mo. banc 1992) (defendant had four prior serious assaultive felonies, including second-degree assault and sodomy); *State v. Nave*, 694 S.W.2d 729, 738 (Mo. banc 1985)(defendant's aggravator was his prior serious assaultive felonies, including armed robbery and forcible rape).

The nature of the crime is clear. Defendant followed and then senselessly killed a 28–year old victim—a complete stranger—because he thought the victim made a pass at his girlfriend. Before the stabbing, defendant said that he was "going to hurt that nigger." After stabbing the victim in the neck, defendant remarked, "One nigger down." Defendant has never demonstrated any remorse for a racist murder. See *State v. O'Neal*, 718 S.W.2d 498, 503 (Mo. banc 1986), *cert. denied*, 480 U.S. 926, 107 S.Ct. 1388, 94 L.Ed.2d 702 (1987).

In proportionality review, this Court considers the strength of the evidence. *Section 565.035.3(3)*. The evidence must be "of the compelling nature usually found in cases where the sentence. is death." *State v. Chaney*, 967 S.W.2d 47, 60 (Mo. banc 1998). Here, it is undisputed that the defendant stabbed the victim after tailing him for blocks. The defendant presented no credible evidence of self-defense. The evidence is compelling that the defendant murdered the victim with deliberation.

Finally, in proportionality review, this Court considers the defendant. *Section 565.035.3(3)*. The evidence includes defendant's conduct during periods of incarceration. The defendant broke a broom-handle over the head of another inmate in 1982. In 1986, defendant admitted assaulting another prisoner. Defendant was investigated for stabbing an inmate in 1993. In 1995, defendant was placed in disciplinary segregation for fighting with another prisoner. While awaiting trial for this murder, defendant attacked jailer Saltkill, injuring his left eye and impairing his vision. Defendant's background does not distinguish him from cases involving similar crimes in which the death penalty was imposed. See *Amrine*, 741 S.W.2d at 672; *Reuscher*, 827 S.W.2d at 715; *Nave*, 694 S.W.2d at 738; see generally *Chaney*, 967 S.W.2d at 60.

■ The purpose of proportionality review is to prevent freakish and wanton applications of the death penalty. *State v. Winfield*, 5 S.W.3d 505, 517 (Mo. banc 1999). The death penalty is not freakish or wanton on the facts of this case.

## V.

The judgment is affirmed.

LIMBAUGH, C.J., WHITE, HOLSTEIN, and PRICE, JJ., and MANNERS, Sp. J., concur.

WOLFF, J., dissents in separate opinion filed.

LAURA DENVIR STITH, J., not participating.

WOLFF, Judge, dissenting.

Because I cannot find evidence of deliberation—a period of cool reflection however brief—I dissent from affirming the first-degree murder conviction and death sentence. Moreover, the United States Supreme Court's recent decision, *Cooper Industries Inc. v. Leatherman Tool Group, Inc.*, —— U.S. ——, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), which requires *de novo* review in punitive damages cases, should apply with equal force to the imposition of the death penalty. Whether the

review is *de novo*, or just careful, it seems that Black's death sentence is the result of trial strategy, not evidence.

## The Standard of Review

Before addressing the particular and troublesome issues raised by this conviction and death sentence, it seems appropriate in light of the *Cooper Industries* decision briefly to consider the standard of review in death penalty cases. When reviewing the constitutionality of the imposition of punitive damages, the Supreme Court holds that an appellate court's review is *de novo*. *Id.* at 1683. Liability for and imposition of punitive damages invokes moral condemnation of reprehensible conduct and, thus, requires *de novo* review of the constitutionality of such punishment in a given case. *Id.* The Supreme Court's opinion cites some of its death penalty jurisprudence in reaching this conclusion. *Id.* at 1684.[1] Even without reference to the Supreme Court's death penalty cases, it seems beyond argument that each imposition of the death penalty presents a constitutional issue and merits the same kind of *de novo* review.

Because of the moral condemnation, punitive damages cases are different, to be used sparingly in only the most extreme cases. *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 110 (Mo. banc 1996).

Punitive damages cases are different. So are death penalty cases.

In punitive damages cases, special judicial scrutiny is warranted: the mere fact that a horrible event has occurred, through the fault of a defendant, may be considered by the jury to supply the necessary element that the defendant acted in conscious disregard for the safety of others even though the conduct was not tantamount to intentional wrongdoing. *See, e.g., Alcorn v. Union Pacific Railroad,* 50 S.W.3d 226, 248 (Mo. banc 2001). Similarly, in this case, the conduct of the defendant Black was loathsome, and a death resulted. These facts may supply, as far as the jury is concerned, the elements needed for conviction and a death sentence.

The *de novo* review required by the *Cooper Industries* reasoning involves a dispassionate review of the punishment. If that kind of protection is to be afforded to corporate defendants under a due process standard, individuals facing death sentences should be afforded no less due process.

While we may leave it to future cases to explore the ramifications of *de novo* review in cases imposing the death penalty, the penalty phase is where *de novo* review is particularly appropriate. One could argue that the independent or proportionality review mandated by section 565.035 meets the standard in *Cooper Industries* for the penalty phase. The statute does call for a review to ensure that the sentence of death is not "imposed under the influence of passion, prejudice, or any other arbitrary factor," and that the Court should determine whether the sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant." Section 565.035.3(1) and (3). This Court has eschewed the statutory invitation to treat like cases alike by refusing to consider similar cases (or even the same case) where lesser sentences are given to other defendants. *See, e.g., State v. Rousan,* 961 S.W.2d 831 (Mo. banc

---

1. The United States Supreme Court cited *Enmund v. Florida,* 458 U.S. 782, 787, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and *Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (opinion of White, J.), as examples where it has enforced limits involving deprivations of life.

1998). Instead, most of our proportionality review consists of finding some similar cases where the death penalty has been imposed-a task that can rather conveniently be done by computer now that there have been 150 or so cases in which the death penalty has been imposed in recent years.

I do not now propose to revisit the issue of our proportionality review. The premise of "proportionality"—when the term refers to eliminating disparities in sentencing—seems flawed. Regardless of similarities in criminal behavior, no two defendants are alike. More importantly, an effort to treat like crimes alike can create a system that is more regulatory than just, as the federal sentencing guidelines system has demonstrated.[2] The proportionality review should be aimed at eliminating disparities that are not based on differences in crimes and defendants. When applied as a formula, such review becomes a game of "count the factors"—if there are enough, then the sentence is right. That mechanistic counting of factors, on appellate review, avoids confronting directly the important question of whether this particular defendant can be said to a moral certainty to have committed a crime that justifies what should be a rare use of the death penalty.

Anyone familiar with the frailties of human institutions, including legal and governmental systems, should not be surprised that our legal system makes mistakes. As Justice Sandra Day O'Connor is reported to have said in a recent speech, "If statistics are any indication, the system may well be allowing some innocent defendants to be executed." [3]

Because we humans are prone to err, even with the strictest standards of proof and judicial review, execution of the innocent is a cost of having the death penalty. The decision of whether or not to have the death penalty, and its attendant and virtually inevitable cost of innocent human life, is a question for the Missouri legislature or the people of this state by constitutional amendment. Courts do not enact statutes or constitutional provisions.

But courts do set standards within the framework of the constitution and statutes. Appropriate judicial review can minimize the cost in human life of errors by the legal system. Appellate *de novo* review is appropriate, and I believe constitutionally required, for both guilt and penalty phases in order to minimize the number of fatal errors.

There are two general kinds of cases where *de novo* review is particularly needed. The first are the easier cases—where there is serious question whether the defendant was involved in the crime. In *State v. Chaney*, 967 S.W.2d 47, 61 (Mo. banc 1998), three judges of this Court were unpersuaded that the state had enough evidence even to submit the case to

---

**2.** Regarding the federal sentencing guidelines, see generally KATE STITH & JOSE A. CABRANES, FEAR OF JUDGING: SENTENCING GUIDELINES IN THE FEDERAL COURTS (Univ. of Chicago Press 1998).

**3.** Justice O'Connor's remarks were reported in The Minneapolis Star Tribune on July 3, 2001. Maria Elena Baca, *Sandra Day O'Connor speaks in Minneapolis*, STAR TRIBUNE ONLINE, July 3, 2001, *available at* http://webserv6.startribune.com. The statistics to which Justice O'Connor referred are as follows: In 1982, when she joined the United States Supreme Court, there were 856 inmates with death sentences, which has increased to 3,711 last year. In 1982 one person was executed; last year there were 85 executions. Also last year, according to Justice O'Connor, six inmates with death sentences were exonerated and released after review, bringing the total of such exonerations to 90 since 1973. There may not be reliable data on the number of persons executed who would have been exonerated.

a jury. The *Chaney* majority, acknowledging the weakness of the evidence, affirmed the conviction with a life sentence. *Id.* at 60. The use of such review has been quite limited. *See State v. Wolfe*, 13 S.W.3d 248, 276–78 (Mo. banc 2000) (Wolff, J., dissenting). The other, more difficult, category of cases involve death sentences where the evidence is extraordinarily weak as to an essential element of the crime or as to aggravating circumstances that justify the death penalty. The weakness may be, as here, that the essential element of deliberation is lacking. Those are cases often involving heated emotions, such as street fights, saloon fights—and this case.

### *De Novo* Review in this Case

In this case, whether or not we apply the *de novo* review rationale of *Cooper Industries*, the two troubling aspects are:

1. There is no evidence of deliberation, that is, "cool reflection." In fact, the testimony of Black's girlfriend in the penalty phase undercuts the notion that this was a premeditated murder. In its all-or-nothing instructions, the trial court did not give the jury the option of convicting Black of anything but first-degree murder.

2. The girlfriend was used by the state in the penalty phase to show racial hatred on Black's part to support its ill-founded submission of "depravity of mind" as an aggravating circumstance. In doing so, the racist language obscures the absence of deliberation that this Court ought to correct through *de novo* review.

### Omission of lesser-included offenses

The facts in this case would amply support a conviction of second-degree murder or voluntary manslaughter, but not first-degree murder. The options of second-degree murder or voluntary manslaughter were not presented in the trial court's instructions.

There is nothing recorded as to the reasons for the defense failure to request instruction on a lesser-included offense. The state and the principal opinion correctly point out the fallacy of plain-error review on such instruction matters at this stage—often the failure is deliberate trial strategy employed with the hope that the case for first-degree murder will seem so insubstantial that the jury will acquit because that is its only alternative. If requested, the instruction of a lesser-included offense is usually warranted in a murder case. *State v. Santillan*, 948 S.W.2d 574, 576 (Mo. banc 1997)

But there is no record of such a request. The defense in this case told the jury in argument in the penalty phase that there are lesser forms of murder, and that this might really only be a second-degree murder. The argument bolsters the impression that there was an "all or nothing" strategy in the guilt phase and, failing that, perhaps the jury would realize in the penalty phase that this was only a second-degree murder case. That is, in the usual course, a matter to be explored in the post-conviction proceeding. It may well be, in light of Black's experience with the legal system, that the failed strategy was directed by a fully informed client.

In death penalty cases, this strategy becomes a twisted version of "you bet your life." The defense ought not to be granted a new trial, on direct appeal, as a result of such strategy. Instead, it seems entirely appropriate to determine whether this really is a set of facts that supports first-degree murder. And, if not, the Court has the option of remanding for sentencing on the offense of second-degree murder supported by the evidence. *State v. O'Brien*, 857 S.W.2d 212, 220 (Mo. banc 1993).

The facts in this case, stripped to their essentials and stated favorably to the state are simple: Black's girlfriend complained to Black that, while she was in a convenience store, Jason Johnson made a pass at her. Black, in his car, chased down the truck in which Johnson was riding. During the chase, according to the girlfriend's testimony in the penalty phase, Black said he was going to "*hurt* that nigger." (Emphasis added.) When Black caught up with the truck, he and Johnson exchanged words. Black got out of his car and stabbed Johnson in the neck, and Johnson threw a beer bottle at Black. Johnson died three days later. After the stabbing, according to the girlfriend, Black said that was "one nigger down."

The girlfriend testified only in the penalty phase. Her testimony is recounted here to give a brief but accurate picture, including her account of Black's racially hateful speech. But does the evidence support the state's contention that this killing met the standard for first-degree murder, i.e., that it was done, as the instruction says, "after deliberation, which means cool reflection upon the matter for any length of time no matter how brief?"

There was time in this case for deliberation but no indication of "cool reflection;" however, time in these circumstances cannot alone suffice to supply evidence of "cool reflection." The evidence showed rage, not cool reflection.

The record reflects that the jury sent the verdict-directing instruction back to the trial judge with a circle around the phrase "cool reflection" and a note: "Judge, please define this phrase." The phrase, of course, was not defined in the judge's response to the note. The jury note, in my view, zeroed in on precisely the issue presented on these facts—whether there was evidence of "cool reflection."

At most the evidence showed that Black purposely injured Jason Johnson. When a defendant "with the purpose of causing serious physical injury" causes a victim's death, that is second-degree murder.[4] "Both second degree murder and first degree murder require that the act be intentionally done. Only first degree murder requires the cold blood, *the unimpassioned premeditation that the law calls deliberation.*" *O'Brien*, 857 S.W.2d at 218 (emphasis added). Black's crime was second-degree murder.

### The prosecution strategy

The prosecution's decision to call the girlfriend in the penalty phase, not the guilt phase, was clever for two reasons. The obvious reason is that the poisonous testimony of racial hate is saved for the penalty phase. But even better for the prosecution was the fact that the girlfriend's testimony undercuts the state's contention that there was deliberation. Black's reported use of the term "nigger" is shocking. The racial epithet distracts from the stated intent to "hurt" Jason Johnson. The statement does not show intent to kill him. Had such testimony been presented in the guilt phase of the trial it would have weakened an already virtually nonexistent case for first-degree murder.

Because of the all-or-nothing submission of first-degree murder instructions, the jury was confronted with two bad choices: acquittal of an awful crime or ignoring the

---

4. Section 565.021, "Second degree murder, penalty," in pertinent part, is as follows:

    1. A person commits the crime of murder in the second degree if he:

(1) Knowingly causes the death of another person or, with *the purpose of causing serious physical injury* to another person, causes the death of another person;
(Emphasis added).

"cool reflection" language and convicting Black of first-degree murder.

On this appeal, this Court has a choice not available to the jury. This Court can affirm a conviction for a lesser-included offense that is supported by the evidence and remand for sentencing. *O'Brien*, 857 S.W.2d at 220.

## The penalty phase submission

The evidence adduced by the state to show that Gary Black was afflicted with depravity of mind was particularly poisonous. If the girlfriend's testimony is believed, Black was possessed by racial hatred. The racial epithets that she attributed to Black were used by the state to show "depravity of mind."

As to the "depravity of mind" aggravator, the trial court instructed the jury, in pertinent part, as follows:

In determining the punishment to be assessed against the defendant for the murder of Jason O. Johnson, you must first unanimously determine whether one or more of the following statutory aggravating circumstances exists:

. . .

2. Whether the murder of Jason O. Johnson involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible and inhuman. You can make a determination of depravity of mind only if you find:

That the defendant killed Jason O. Johnson for the purpose of causing suffering to another person and thereby exhibited a callous disregard for the sanctity of all human life.

The state correctly concedes in this appeal that the "depravity of mind" aggravator was not justified in this case. *See*

*State v. Smith*, 756 S.W.2d 493, 501 (Mo. banc 1988).[5] Under our cases, cited in the principal opinion, proof of one statutory aggravating circumstance is the threshold requirement for the jury to consider whether the death penalty is justified. *State v. Shafer*, 969 S.W.2d 719, 739 (Mo. banc 1998). Black's two 1976 convictions suffice to meet this threshold.

However, the jury heard the evidence of racist motive, the trial court's instruction on "depravity of mind," and the prosecution's arguments that tied the racist motive to "depravity of mind." This is not simply a question of evidence to be governed by section 565.032.1(2), as the principal opinion contends. Here the evidence was augmented by the "depravity of mind" submission, and the jury's verdict tainted by submission of the evidence as proof of depravity of mind.

Errors in the penalty phase "can prejudice the defendant by preempting the jury from choosing the 'life' alternative," as this Court pointed out in *State v. Shurn*, 866 S.W.2d 447, 463 (Mo. banc 1993) (citing *Espinosa v. Florida*, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992)). Errors of evidence in the penalty phase can sometimes be disregarded because trial judges can be presumed not to consider improper evidence when sentencing defendants.

The presumption that the trial court did not consider an improper submission in sentencing does not apply here because the trial court concluded, incorrectly, that the depravity of mind aggravator was warranted.

The possible prejudicial preemption of the life-sentence alternative from the jury

---

**5.** See also *State v. Preston*, 673 S.W.2d 1, 11 (Mo. banc 1984), and *State v. Griffin*, 756 S.W.2d 475, 490 (Mo. banc 1988), where the Court lists numerous factors as to what types of murders constitute "depravity of mind."

echoes in this appeal. The principal opinion relies on evidence of Black's racially hateful speech and his other assaultive behavior—apparently also introduced to show "depravity of mind"—to justify affirming the sentence. In the circumstances of an improper submission this is, to put it mildly, an unusually high degree of deference to a tainted verdict. That, it seems to me, is not even close to the *de novo* review this Court would and should grant in a punitive damages case.

A function of *de novo* review is to evaluate the evidence supporting the death penalty dispassionately. As the Supreme Court said of punitive damages in the *Cooper Industries* case, the punishment is not a fact found by the jury, but is a condemnation to be subjected to *de novo* appellate review. 121 S.Ct. at 1686.

In this death penalty case, the jury's determination is not a finding of fact—it is a recommendation to the trial court judge. In this case the jury's recommendation was tainted by the evidence of racial hatred that was linked to the unsupported notion of "depravity of mind." To get the death penalty, it may have been necessary for the state to show that Black is a racist bully. It certainly helped the state in sustaining the penalty on appeal to this Court.

The erstwhile girlfriend, who for all anyone knows was in some legal jeopardy of her own because of her participation in Black's flight, supplied what the state needed. But in proper context, on *de novo* review, her testimony exposes the nonexistence of the state's case as to deliberation, supplying evidence not of an intent to kill but to hurt.

**Conclusion**

The defense's apparent trial strategy of all-or-nothing on first-degree murder clearly failed. And the prosecution's trial strategy was more clever than that of the defense. But when a death sentence is the result of trial strategy, not evidence, correction on appeal is constitutionally required. Gary Black is guilty of a serious crime, second-degree murder, for which he could serve a life sentence. But he should not be executed for a failed trial strategy.

Black's conviction should be reversed, and the case remanded to the trial court for entry of a judgment and sentence for second-degree murder.